## CARPENTERS & JOINERS UNION OF AMERICA, LOCAL NO. 213, ET AL. v. RITTER'S CAFE ET AL.

No. 527.   Argued January 13, 1942.—Decided March 30, 1942.

*Messrs. Sewall Myer* and *Joseph A. Padway* argued the cause, and *Mr. Myer* was on the brief, for petitioners.

*Mr. Bernard A. Golding,* with whom *Mr. William A. Vinson* was on the brief, for respondents.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The facts of this case are simple.   Ritter, the respondent, made an agreement with a contractor named Plaster for the construction of a building at 2810 Broadway, Houston, Texas.   The contract gave Plaster the right to make his own arrangements regarding the employment of labor in the construction of the building.   He employed nonunion carpenters and painters.   The respondent was also

the owner of Ritter's Cafe, a restaurant at 418 Broadway, a mile and a half away. So far as the record discloses, the new building was wholly unconnected with the business of Ritter's Cafe. All of the restaurant employees were members of the Hotel and Restaurant Employees International Alliance, Local 808. As to their restaurant work, there was no controversy between Ritter and his employees or their union. Nor did the carpenters' and painters' unions, the petitioners here, have any quarrel with Ritter over his operation of the restaurant. No construction work of any kind was performed at the restaurant, and no carpenters or painters were employed there.

But because Plaster employed non-union labor, members of the carpenters' and painters' unions began to picket Ritter's Cafe immediately after the construction got under way. Walking back and forth in front of the restaurant, a picket carried a placard which read: "This Place is Unfair to Carpenters and Joiners Union of America, Local No. 213, and Painters Local No. 130, Affiliated with American Federation of Labor." Later on, the wording was changed as follows: "The Owner of This Cafe Has Awarded a Contract to Erect a Building to W. A. Plaster Who is Unfair to the Carpenters Union 213 and Painter Union 130, Affiliated With the American Federation of Labor." According to the undisputed finding of the Texas courts, which is controlling here, Ritter's Cafe was picketed "for the avowed purpose of forcing and compelling plaintiff [Ritter] to require the said contractor, Plaster, to use and employ only members of the defendant unions on the building under construction in the 2800 block on Broadway." Contemporaneously with this picketing, the restaurant workers' union, Local No. 808, called Ritter's employees out on strike and withdrew the union card from his establishment. Union truck drivers refused to cross the picket line to deliver food and other supplies to the res-

taurant. The effect of all this was "to prevent members of all trades-unions from patronizing plaintiff's cafe and to erect a barrier around plaintiff's cafe, across which no member of defendant-unions or an affiliate will go." A curtailment of sixty per cent of Ritter's business resulted.

Holding the petitioners' activities to constitute a violation of the state anti-trust law, Texas Penal Code, Art. 1632 *et seq.*, the Texas Court of Civil Appeals enjoined them from picketing Ritter's Cafe. The decree forbade neither picketing elsewhere (including the building under construction by Plaster) nor communication of the facts of the dispute by any means other than the picketing of Ritter's restaurant. 149 S. W. 2d 694. We brought the case here to consider the claim that the decree of the Court of Civil Appeals (the Supreme Court of Texas having refused a writ of error) infringed the freedom of speech guaranteed by the Due Process Clause of the Fourteenth Amendment. 314 U. S. 595.

The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest. And every intervention of government in this struggle has in some respect abridged the freedom of action of one or the other or both.

The task of mediating between these competing interests has, until recently, been left largely to judicial lawmaking and not to legislation. "Courts were required, in the absence of legislation, to determine what the public welfare demanded;—whether it would not be best subserved by leaving the contestants free to resort to any means not

involving a breach of the peace or injury to tangible property; whether it was consistent with the public interest that the contestants should be permitted to invoke the aid of others not directly interested in the matter in controversy; and to what extent incidental injury to persons not parties to the controversy should be held justifiable." Mr. Justice Brandeis in *Truax* v. *Corrigan*, 257 U. S. 312, 363. The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted. See Mr. Justice Holmes in *Aikens* v. *Wisconsin*, 195 U. S. 194, 205, and Mr. Justice Brandeis in *Truax* v. *Corrigan*, *supra*, at 372, *Dorchy* v. *Kansas*, 272 U. S. 306, 311, and *Senn* v. *Tile Layers Protective Union*, 301 U. S. 468, 481. But the petitioners now claim that there is to be found in the Due Process Clause of the Fourteenth Amendment a constitutional command that peaceful picketing must be wholly immune from regulation by the community in order to protect the general interest, that the states must be powerless to confine the use of this industrial weapon within reasonable bounds.

The constitutional right to communicate peaceably to the public the facts of a legitimate dispute is not lost merely because a labor dispute is involved, *Thornhill* v. *Alabama*, 310 U. S. 88, or because the communication takes the form of picketing, even when the communication does not concern a dispute between an employer and those directly employed by him. *American Federation of Labor* v. *Swing*, 312 U. S. 321. But the circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction or render it completely inviolable. Where, as here, claims on behalf of free speech are met with claims on be-

half of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain. Whenever state action is challenged as a denial of "liberty," the question always is whether the state has violated "the essential attributes of that liberty." Mr. Chief Justice Hughes in *Near* v. *Minnesota,* 283 U. S. 697, 708. While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies "to promote the health, safety, morals and general welfare of its people. . . . The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise." *Ibid.,* at 707. "The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side." *Hudson Water Co.* v. *McCarter,* 209 U. S. 349, 355.

In the circumstances of the case before us, Texas has declared that its general welfare would not be served if, in a controversy between a contractor and building workers' unions, the unions were permitted to bring to bear the full weight of familiar weapons of industrial combat against a restaurant business, which, as a business, has no nexus with the building dispute but which happens to be owned by a person who contracts with the builder. The precise question is, therefore, whether the Fourteenth Amendment prohibits Texas from drawing this line in confining the area of unrestricted industrial warfare.

Texas has undertaken to localize industrial conflict by prohibiting the exertion of concerted pressure directed at the business, wholly outside the economic context of the real dispute, of a person whose relation to the dispute arises from his business dealings with one of the dispu-

tants. The state has not attempted to outlaw whatever psychological pressure may be involved in the mere communication by an individual of the facts relating to his differences with another. Nor are we confronted here with a limitation upon speech in circumstances where there exists an "interdependence of economic interest of all engaged in the same industry," *American Federation of Labor* v. *Swing*, 312 U. S. 321, 326. Compare *Journeymen Tailors Union Local No. 195* v. *Miller's, Inc.*, 312 U. S. 658, and *Bakery & Pastry Drivers & Helpers Local No. 802* v. *Wohl, post*, p. 769. The line drawn by Texas in this case is not the line drawn by New York in the *Wohl* case. The dispute there related to the conditions under which bakery products were sold and delivered to retailers. The business of the retailers was therefore directly involved in the dispute. In picketing the retail establishments, the union members would only be following the subject-matter of their dispute. Here we have a different situation. The dispute concerns the labor conditions surrounding the construction of a building by a contractor. Texas has deemed it desirable to insulate from the dispute an establishment which industrially has no connection with the dispute. Texas has not attempted to protect other business enterprises of the building contractor, Plaster, who is the petitioners' real adversary. We need not therefore consider problems that would arise if Texas had undertaken to draw such a line.

It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute, peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing

to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose.

In forbidding such conscription of neutrals, in the circumstances of the case before us, Texas represents the prevailing, and probably the unanimous, policy of the states.[1] We hold that the Constitution does not forbid Texas to draw the line which has been drawn here. To hold otherwise would be to transmute vital constitutional liberties into doctrinaire dogma. We must be mindful that "the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants." *Thornhill* v. *Alabama*, 310 U. S. 88, 103-04.

It is not for us to assess the wisdom of the policy underlying the law of Texas. Our duty is at an end when we find that the Fourteenth Amendment does not deny her the power to enact that policy into law.

*Affirmed.*

---

[1] The authorities are collected in Teller, Labor Disputes and Collective Bargaining (1940), § 123; Hellerstein, Secondary Boycotts in Labor Disputes, 47 Yale L. J. 341; Frey, Cases on Labor Law (1941), pp. 239-73; cf. Galenson and Spector, The New York Labor-Injunction Statute and the Courts, 42 Col. L. Rev. 51, 68-71.

MR. JUSTICE BLACK, dissenting, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY concur.

The petitioners sought to convey to the public certain information. The injunction here sustained imposed two restraints on their doing so: (1) it enjoined them from picketing the respondent's cafe; (2) it enjoined them from carrying banners in front of the respondent's cafe, banners which contained inscriptions telling the public that the respondent had awarded a building contract to a man who was unfair to organized labor.

One member of the petitioner unions at a time peacefully walked in front of the respondent's cafe, carrying such a banner. It is not contended that the inscriptions were untruthful, nor that the language used was immoderate. There was no violence threatened or apprehended. Passers-by were not molested. It is clear from the opinion of the Texas Court of Civil Appeals that the injunction against picketing was granted not because of any law directly aimed at picketing—Texas has no statute against picketing as such—nor to prevent violence, disorder, breach of the peace, or congestion of the streets. The immediate purpose of the injunction was to frustrate the union's objective of conveying information to that part of the public which came near the respondent's place of business, an objective which the court below decided was a violation of Texas antitrust laws. Conveying this truthful information in the manner chosen by the union was calculated to, and did, injure the respondent's business. His business was injured because many of those whom the information reached were sympathetic with the union side of the controversy and declined to patronize the respondent's cafe or have any other business transactions with him. Does injury of this kind to the respondent's business justify the Texas courts in thus restricting freedom of expression?

I am unable to agree that the controversy which prompted the unions to give publicity to the facts was no more than a private quarrel between the union and the non-union contractor. Whether members or non-members of the building trades unions are employed is known to depend to a large extent upon the attitude of building contractors. Their attitude can be greatly influenced by those with whom they do business. Disputes between one or two unions and one contractor over the merits and justice of union as opposed to non-union systems of employment are but a part of the nationwide controversy over the subject. I can see no reason why members of the public should be deprived of any opportunity to get information which might enable them to use their influence to tip the scales in favor of the side they think is right.

If there had been any doubt before, I should have thought that our decision in *Thornhill* v. *Alabama,* 310 U. S. 88, settled the question. There we said at pages 102–104: "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . . Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society. The issues raised by regulations, such as are challenged here, infringing upon the right of employees effectively to inform the public of the facts of a labor dispute are part of this larger problem. . . . It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. . . . But the group in power at any moment may not impose penal sanctions on

peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests."

Whatever injury the respondent suffered here resulted from the peaceful and truthful statements made to the public that he had employed a non-union contractor to erect a building. This information, under the *Thornhill* case, the petitioners were privileged to impart and the public was entitled to receive. It is one thing for a state to regulate the use of its streets and highways so as to keep them open and available for movement of people and property, *Schneider* v. *State,* 308 U. S. 147, 160; or to pass general regulations as to their use in the interest of public safety, peace, comfort, or convenience, *Cantwell* v. *Connecticut,* 310 U. S. 296, 306–307; or to protect its citizens from violence and breaches of the peace by those who are upon them, *Thornhill* v. *Alabama, supra,* 105. It is quite another thing, however, to "abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature. . . ." *Schneider* v. *State, supra,* 160. The court below did not rest the restraints imposed on these petitioners upon the state's exercise of its permissible powers to regulate the use of its streets or the conduct of those rightfully upon them. Instead, it barred the petitioners from using the streets to convey information to the public, because of the particular type of information they wished to convey. In so doing, it directly restricted the petitioners' rights to express themselves publicly concerning an issue which we recognized in the *Thornhill* case to be of public importance. It imposed the restriction for the reason that the public's response to such information would result in injury to a particular person's business, a reason which we said in the *Thornhill* case was insufficient to justify curtailment of free expression.

The injunction is defended, however, on the ground that the petitioners have been prohibited from passing information to the public at only some, but not at all, places. It may be that the petitioners are left free to inform the public at other places or in other ways. Possibly they might, at greater expense, reach the public over the radio or through the newspapers, although, if the theory of the court below be correct, it would seem that they could be enjoined from using these means of communication, too, to persuade people not to patronize the respondent's cafe. In any event, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State, supra,* 163.

Accepting the Constitutional prohibition against any law "abridging the freedom of speech or of the press"—a prohibition made applicable to the states by the Fourteenth Amendment—"as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow," *Bridges* v. *California,* 314 U. S. 252, 263, I think the judgment should be reversed.

MR. JUSTICE REED, dissenting:

The Texas court enjoined petitioners, a labor union of carpenters and joiners, another union of painters, and all of their members from picketing the restaurant of the respondent, E. R. Ritter, plaintiff below, doing business under the trade name of Ritter's Cafe, at 418 Broadway, in Houston, "and from carrying banners peacefully and in any other manner upon the sidewalks in front" of the restaurant. There had been no violence. Only two pickets, one from each union, walked back and forth, carrying placards which before the injunction issued were modified to read, "The Owner of This Cafe Has Awarded a Contract to Erect a Building to W. A. Plaster Who is Unfair to the

Carpenters Union 213 and Painter Union 130, Affiliated with the American Federation of Labor."

Plaster, a building contractor, was putting up a structure for respondent, Ritter, in the 2800 block of Broadway, under a contract which did not require Plaster to employ union labor. The record does not show whether or not this new building is to be used in the restaurant business. He was employing non-union workers. The restaurant, however, was unionized, its employees being members of Hotel and Restaurant Employees' Local 808. They quit on the day the picketing began, union drivers refused to deliver supplies, and the business slumped sixty per cent. The court found petitioners' conduct an invasion of respondents' right to conduct a legitimate business and an attempt to interfere illegally with a contract with third parties.

The injunction was issued by the Texas court because such invasion or attempt at invasion of the rights of a business man was held "to create restrictions in the free pursuit" of business, contrary to the Texas anti-trust laws. Tex. Rev. Civ. Stat. (Vernon, 1936) Arts. 7426, 7428; Tex. Penal Code (Vernon, 1936) Arts. 1632, 1634, 1635. 149 S. W. 2d 694. The petitioners' challenge to the validity of the injunction is based on the constitutional right of free speech, guaranteed them by the Fourteenth Amendment to the Constitution of the United States. *Schneider* v. *State,* 308 U. S. 147, 160.

This challenge involves two particularly delicate relationships. These are that between the federal and state governments, and that between a state and labor unions within its borders. So far as the injunction depends upon the action of the Texas court in construing its anti-trust statutes to forbid such interference with the restaurant business, the order is unassailable here. But if such an interpretation denies to Texans claimed rights guaranteed to them by the federal Constitution, the state authority must

accommodate its orders to preserve that right. Cf. *International Harvester Co.* v. *Kentucky,* 234 U. S. 216; *Lindsey* v. *Washington,* 301 U. S. 397, 400; *Minnesota* v. *Probate Court,* 309 U. S. 270, 273.

Recent cases in this Court have sought to make more definite the extent and limitations of the rights of free speech in labor disputes. For some time, there has been general acceptance of the fundamental right to publicize "the facts of a labor dispute in a peaceful way through appropriate means." One of the recognized means is by orderly picketing with banners or placards. *Thornhill* v. *Alabama,* 310 U. S. 88, 104. In *Carlson* v. *California,* 310 U. S. 106, 113, we said: "For the reasons set forth in our opinion in *Thornhill* v. *Alabama, supra,* publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgment by a State." The desire of both sides in labor controversies to gain advantages for themselves and limit similar opportunities for their opponents has led each to seek to expand or contract the constitutionally protected area for picketing operations as suits their respective purposes. Recognition of the basic right to picket made the location of lines beyond which picketing could not be employed an important objective of those who suffer from its use.

In the *Carlson* and *Thornhill* cases, legislation forbidding picketing for the purpose of interfering with the business of another was invalidated because it was an unconstitutional prohibition of the worker's right to publicize his situation. It was not thought of sufficient importance in either case to mention in the opinion whether the picket was an interested disputant with those picketed or an utter stranger to the controversy and the industry. In those

carefully phrased decisions the possibility of state control of socially menacing evils, flowing from industrial disputes, was recognized, but those general evils were not of the kind which were considered to warrant interference with free speech by peaceful picketing.[1] We said:

"It is true that the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants. See Mr. Justice Brandeis in 254 U. S. at 488. It does not follow that the State in dealing with the evils arising from industrial disputes may impair the effective exercise of the right to discuss freely industrial relations which are matters of public concern. A contrary conclusion could be used to support abridgment of freedom of speech and of the press concerning almost every matter of importance to society." [2]

An instance of state control over peaceful picketing soon appeared. In *Drivers Union* v. *Meadowmoor Co.*, 312 U. S. 287, this Court, though not without dissent, upheld Illinois' ruling that, where "acts of picketing in themselves peaceful" are enmeshed in violence, immediate future peaceful picketing may be enjoined. This decision compelled a less extreme result in *Hotel & Restaurant Employees' Alliance* v. *Wisconsin Employment Relations Board, ante,* p. 437. In the latter case, the order approved "forbids only violence" and "permits peaceful picketing." Nothing more than the validity of prohibitions against violence was decided as to the constitutionality of the Wisconsin Employment Peace Act.

---

[1] Evidently the conception was that of "imminent and aggravated danger," *A. F. of L.* v. *Swing,* 312 U. S. 321, 325.

[2] 310 U. S. 88, 103–104.

On the same day that *Meadowmoor* was handed down, *A. F. of L.* v. *Swing,* 312 U. S. 321, was decided. In *Swing's* case a union of beauty shop workers picketed a beauty parlor. They were not and had not been employees of the establishment. We stated the issue thus:

"More thorough study of the record and full argument have reduced the issue to this: is the constitutional guarantee of freedom of discussion infringed by the common law policy of a state forbidding resort to peaceful persuasion through picketing merely because there is no immediate employer-employee dispute?" [3]

There was nothing in the opinion to intimate that the answer would have varied, if the union had been a local of the teamsters or painters. The injunction granted by Illinois was set aside with these words:

"Such a ban of free communication is inconsistent with the guarantee of freedom of speech. That a state has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the Bill of Rights. The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. *American Steel Foundries* v. *Tri-City Council,* 257 U. S. 184, 209. The right of free communication cannot therefore be mutilated by denying it to work-

[3] 312 U. S. 321, 323.

ers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in *Thornhill's* case. 'Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' *Senn* v. *Tile Layers Union*, 301 U. S. 468, 478." [4]

Today this Court decides *Bakery & Pastry Drivers & Helpers Local 802* v. *Wohl, post,* p. 769. In this case the union picketed manufacturing bakers who sold to, and threatened to picket grocers and retail bakers who bought from, peddlers. The peddlers purchased bakery goods and sold them to the trade. The labor controversy was the effort of the unions to compel the peddlers to hire a union driver one day a week. The state forbade the picketing of the manufacturers and of the retailers, regardless of whether the picketing placards were directed at the product or the general business of the retailers. [5] Although there is no possible labor relation between the peddlers and their customers, or between the grocers and retail bakers, and the union, we decline to permit New York to take steps to protect the places of business of those who dealt with the peddlers against picketing. It seems obvious that the selling of baked products, distributed by

[4] 312 U. S. 321, 325-326.

[5] "It is hereby ordered, . . . that the defendants, . . . are perpetually restrained and enjoined:

(a) From picketing the places of business of manufacturing bakers who sell to the plaintiffs . . . because of the fact that said manufacturing bakers sell to these plaintiffs; and

(b) From picketing the places of business of customers of these plaintiffs because such customers purchase baked products from these plaintiffs; . . . ."

the peddlers, is a minor part of the grocery business. Recent cases illustrate the present tendency of state courts to permit workers outside the industry picketed to publicize their labor disputes with others.[6] To permit the *Wohl* injunction, without evidence of special embarrassment to peace and order, would, we hold, go beyond permissible limitations on free speech.

We are of the view that the right of free speech upheld in these decisions requires Texas to permit the publicizing of the dissatisfaction over Mr. Ritter's contract for his new building. Until today, orderly, regulated picketing has been within the protection of the Fourteenth Amendment. Such picketing was obviously disadvantageous to the business affected. In balancing social advantages it has been felt that the preservation of free speech in labor disputes was more important than the freedom of enterprise from the burdens of the picket line. It was a limitation on state power to deal as it pleased with labor disputes; a limitation consented to by the state when it became a part of the nation, and one of precisely the same quality as those enforced in *Carlson, Thornhill* and *Swing*.

We are not here forced, as the Court assumes, to support a constitutional interpretation that peaceful picketing "must be wholly immune from regulation by the community in order to protect the general interest." We do not doubt the right of the state to impose not only some but many restrictions upon peaceful picketing. Reasonable numbers, quietness, truthful placards, open ingress and egress, suitable hours or other proper limitations, not

---

[6] *People* v. *Harris,* 104 Colo. 386, 91 P. 2d 989 (May, 1939); *Byck Bros. & Co.* v. *Martin,* 4 C. C. H. Labor Cases ¶ 60,430 (Ky. Cir. Ct., March, 1941); *Ellingsen* v. *Milk Wagon Drivers' Union,* 377 Ill. 76, 35 N. E. 2d 349 (June, 1941); *People* v. *Muller,* 286 N. Y. 281, 36 N. E. 2d 206 (July, 1941); *Maywood Farms Co.* v. *Milk Wagon Drivers' Union,* 313 Ill. App. 24, 38 N. E. 2d 972 (January, 1942); *Mason & Dixon Lines* v. *Odom,* 18 S. E. 2d 841 (Ga., February, 1942).

destructive of the right to tell of labor difficulties, may be required. The Court limits its holding to the peculiar circumstances of this case. All decisions necessarily are so limited, but from the decisions rules are drawn. By this decision a state rule is upheld which forbids peaceful picketing of businesses by strangers to the business and the industry of which it is a part. The legal kernel of the Court's present decision is that the "sphere" of free speech is confined to the "area of the industry within which a labor dispute arises." This rule is applied, in this case, even though the picketers are publicizing a labor dispute arising from a contract to which the sole owner of the business picketed is a party. Even if the construction contract covered an attached addition to the restaurant, the Court's opinion would not permit picketing directed against the restaurant. To construe this Texas decision as within state powers and the *Wohl* decision as outside their boundaries, plainly discloses the inadequacy of the test presumably employed, that is, the supposed lack of economic "interdependence" between the picketers and the picketed.

The philosophy behind the conclusion of the Court in this case gives to a state the right to bar from picket lines workers who are not a part of the industry picketed. We are not told whether the test of eligibility to picket is to be applied by crafts or enterprises, or how we are to determine economic interdependence or the boundaries of particular industries. Such differentiations are yet to be considered. The decision withdraws federal constitutional protection from the freedom of workers outside an industry to state their side of a labor controversy by picketing. So long as civil government is able to function normally for the protection of its citizens, such a limitation upon free speech is unwarranted.