Hast, J.
The question presented is whether there was a plan formally or informally adopted and followed in concert by the defendants Pfeiffer, 0 ’Day and the unions in picketing and bannering the construction project and thereby exerting pressure upon members of the several craft unions employed on the construction job to bring about a concerted work stoppage and thus cause Barnes, as the general contractor of such construction, to order his subcontractor Iiolt to cancel the employment of the plaintiff and its men because *548 the men were not members of the union, and, if so, whether such concerted plan constituted an unlawful interference with the rights of the plaintiff.
At the outset, it is appropriate to observe that the subject matter of this action does not involve a labor controversy between the plaintiff and the local union, because the record discloses that Anderson never interfered with the right of his employees to join the union but took the position that membership in the union was a matter for the determination of the employees alone. It does not involve a controversy between Anderson and its employees, or a three-way controversy among Anderson, its employees and the members of the public as patrons or customers of Anderson. It does not involve a controversy between Anderson and Barnes, the general contractor, or between Anderson and any of the subcontractors or members of the union who are employees of Barnes, Holt, or any other subcontractor. And, lastly, it does not involve a controversy between Barnes or Holt and the members of the several craft unions made parties defendant to this action. There was no claim or evidence to support one that there was any contract between Barnes and any of the unions involved wherein Barnes agreed that it or its subcontractors would employ only members of the local union on the construction project.
The plaintiff claims that the defendants, in picketing- and bannering the construction premises because nonunion workers were employed by it, had the far-reaching purpose of inducing the union employees of Barnes to quit work and strike, so that Barnes, as the general contractor, would order Holt, the subcontractor employing the plaintiff, to cancel Anderson’s employment; and that such claimed intended events did follow, constituting an illegal secondary boycott.
*549 On the other hand, the defendants claim there was no evidence that there was a strike of Barnes’ employees; that, if there was such strike, any of the defendants induced it; that there was any purpose to force a cancellation of a contract of employment; or that there was any contract in fact which was subject to cancellation.
Counsel for defendants raise some incidental and collateral issues which should first be disposed of. In their brief they make a rather feeble protest that there was no evidence that Pfeiffer had authority to act for the unions in placing the picket and banner at the construction site. Pfeiffer was an officer and organizer of the local union. As such, it was his duty to obtain members for the union including Anderson’s employees who were eligible as truck drivers, and the undisputed evidence is that one purpose of the bannering was to bring about the unionization of Anderson’s men. Furthermore, the members of the union working on this job made no protest concerning Pfeiffer’s act in placing the picket and banner. Most of them acquiesced and aided in its purpose and accepted the fruits of Pfeiffer’s efforts. Thus, aside from his office and employment as a representative of the union, the members conspired with him to make the bannering effective.
It is also suggested that there was no evidence of a contract for Anderson’s employment by Holt and consequently no contract which could be cancelled or breached. The separate answers of Pfeiffer, O’Day and the local union admit the allegations contained in paragraphs 1, 2, 3 and 6 of plaintiff’s petition.
Paragraph six of the petition is as follows:
“On or about February 10, 1949, plaintiff was engaged in delivering building materials and commodities consisting of bank-run gravel and dirt to the site where the tuberculosis hospital — health center build *550 ing is being constructed at the Ohio State University, Columbus, Ohio, pursuant to a contract between the plaintiff and H. W. Holt & Son Company. * * *”
Both Holt and Anderson testified as to the arrangement between them for the latter to haul gravel to the job site. The terms of the contract were not offered in evidence, but counsel doubtless relied on the admissions in defendants’ answers to the effect that one existed. The fact is that this contract was not questioned or disputed in the trial of the cause.
The defendants insist that there was no evidence that any of their activities throughout this controversy constituted a concert of action; that there was no evidence of meetings or conferences whereat plans for concert of action were discussed, formulated or put in operation ; and that they had a right to peacefully picket the premises where nonunion men were working and to advertise the fact, that plaintiff’s men were not members of the union, as a part of an organizational campaign for membership in the union.
The character of conduct and behavior as well as its legality may be determined by its purpose as shown by words, acts, implications and the logic of all the surrounding circumstances. It is quite apparent that the prime objective of the defendants in the situation was to secure the unionization of Anderson’s men and thus secure a completely unionized construction project. Admittedly, to that end the picket and banner were placed. When Pfeiffer was asked, in the course of his examination as a witness, “what was your purpose in having a banner placed or carried at this job?,” he replied: “I have been endeavoring for more than a year and a half to two years to organize Anderson’s drivers, I have contacted them at their home, I have talked to them on the street, I have talked to them on jobs, and I hadn’t been too successful in getting enough *551 people to make a bargain of it, so I thought the next best thing * * * was to banner.”
From the nature, character and location of the banner, it is apparent that it was not designed to inform the public generally or Anderson’s men in particular that the latter were not members of the union. That fact was already known to Anderson’s men and the members of the public were not dealing with Anderson or likely to see the banner at the construction project. If the bannering was designed to disparage Anderson in the eyes of the public because it did not employ union men, the logical and rational bannering point would have been Anderson’s place of business in Columbus where customers and members of the public would go to deal with it. The purpose of the bannering stands out in bold relief in the peculiar terminology of the banner language. It did not simply say, “Anderson does not employ union labor,” but that “Anderson does not employ members of Teamsters Local 311 Affiliated With the Building Trades Council A. F. of L.” (Italics supplied.) In other words, it made plain to Barnes’ men that Anderson’S men were not members of a union. Pfeiffer must have known that this banner would attract the attention of Barnes ’ men and he evidently intended that it should do so.
Very shortly after the banner was placed, the great majority of Barnes’ men quit work in concert on the same day. For what reason? They had no labor dispute with their employer Barnes. The only circumstance changing their employment situation was the fact that the construction site had been bannered, and two men to whom inquiry was made as to the reason for quitting work replied that they did not want to work behind a banner. Furthermore, when Anderson had been ordered off the job at the direction of *552 Barnes and the banner had been removed, the men immediately returned to work.
A few days later, after defendants had been unable to furnish Holt with union truck drivers, Anderson and its men, still unorganized, returned to work. The propriety of replacing the banner rested wholly with the defendants. The decision was made' at this time in the light of definite experience as to the effect of the previous placing of the banner. The defendants knew almost to a certainty that the placing of the banner a second time would bring about the same results, namely, stoppage of work on the part of Barnes’ employees and an order of Barnes to Holt to discharge Anderson and its men, all of which as a matter of fact did follow. Then finally, after the second work stoppage, Pfeiffer and O’Day in concert sought and had a conference with Barnes’ representative and, as a result of that conference, made sure that the order from Barnes to Holt was in definite and written form and according to their demand.
In view of these circumstances the inescapable conclusion is that there was a concert of action on the part of the defendants to bring about a cessation of work on the part of the employees of Barnes as long as the construction site was bannered, to exert pressure against Barnes and through Barnes against Holt to compel Anderson to unionize its employees or to surrender and cancel its contract with Holt. Both the Common Pleas Court and the Court of Appeals in the instant case found that the bannering had the intended effect of causing Barnes’ men to quit work for pressure purposes.
The Common Pleas Court in its opinion on this subject said:
“We are of the opinion that the evidence shows a preconceived plan between Mr. Pfeiffer and his Union *553 No. 31Í and Mr. O’Day, acting for or assuming to act for the defendant, the Building Trades Council, to coerce the men who were members of the several crafts employed upon said project to a concerted work stoppage and thus to force the general contractor to order its subcontractors, II. W. Holt & Son Company, to cease dealing with the plaintiff.”
The Court of Appeals in its opinion said “that one effect of the placing of the banner was to cause the union men to leave their job is manifest.”
Generally, in industry and labor controversies, industry claims that picketing or bannering a work project by the concerted action of any group for the purpose of interrupting the peaceful relationship of those engaged in the project is an unlawful interference with legitimate business and falls outside the legal rights of those who employ it. On the other hand, labor claims that it is privileged to use these means to communicate proper information and the facts of its side of a controversy to the public and to the members of its organization, and that in so doing it is protected by the constitutional guaranties of free speech.
Prior to 1937, picketing and other economic pressures applied by labor unions had been generally regarded by the state courts as prima facie torts unless a justifiable purpose was shown. Vegelahn v. Guntner, 167 Mass., 92, 44 N. E., 1077, 57 Am. St. Rep., 443, 35 L. R. A., 722; Plant v. Woods, 176 Mass., 492, 57 N. E., 1011, 79 Am. St. Rep., 330, 51 L. R. A., 339; Jersey City Printing Co. v. Cassidy, 63 N. J. Eq., 759, 53 A., 230.
Presently, the weight of authority seems to be that workers may laAvfully by means of pickets, banners, circulars, newspaper announcements, radio broadcasts or any other appropriate method announce their grievances to the public in order to persuade prospective employees as well as prospective customers to *554 refrain from dealing with their employers. Jefferson & Indiana Coal Co. v. Marks, 287 Pa., 171, 134 A., 430, 47 A. L. R., 745; International Pocketbook Workers' Union v. Orlove, 158 Md., 496, 148 A., 826; Levy & Devaney, Inc., v. International Pocketbook Workers' Union, 114 Conn., 319, 158 A., 795; Lisse v. Local Union No. 31, 2 Cal. (2d), 312, 41 P. (2d), 314; 35 Michigan Law Review, 73. However, the privilege of picketing or bannering is limited to peaceful persuasion and is lost when there is resort to violence, intimidation, falsehood, defamation, obstruction of highways, obstruction to means of access to employer’s place of business or other unlawful means.
Prior to 1937, the Supreme Court of the United States took the view that picketing and bannering were solely means of communication and as such the right thereto was protected by the constitutional guaranty of free speech. Two important implications resulted. First, the validity of limitations and prohibitions affecting the practice of picketing or bannering, imposed by injunctional process or statutory enactment, became a federal question with the result that the state courts were obliged to conform to the rulings of the Supreme Court on the validity or constitutionality of such limitations, and, second, the recognition of the practice of picketing or bannering, purely as a means of communication, removed its consideration from the category of tort law wherein the person engaged in the activity would be burdened with the obligation to show justification.
More recently, the federal Supreme Court seems to have changed its view and position on this vital question. A brief resume of decisions of that court on this question is appropriate. In 1937, the case of Senn v. Tile Layers Protective Union, 301 U. S., 468, 81 L. Ed., 1229, 57 S. Ct., 857, reached that court. Senn *555 employed a few nonunion workers in a small tile-laying business. He, bimself, did a large amount of the most important work. He refused a demand to unionize his employees for the reason that under union regulations he would not be permitted to perform labor on the job. The union established a picket line at his place of business. He sought an injunction 'but his petition in a Wisconsin state court was dismissed under a statute prohibiting the granting of an injunction against peaceful picketing in a “labor dispute.” The federal Supreme Court, in a five-to-four decision, sustained the state courts, holding that Senn’s rights were not invaded by the statute. Mr. Justice Brandies, in the course of the opinion, inserted by way of dictum the following:
“Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the federal Constitution * * *.”
In the case of Thornhill v. Alabama, 310 U. S., 88, 84 L. Ed., 1093, 60 S. Ct., 736, the appellant was convicted under an Alabama statute which made it unlawful for one “to picket the * * # place of business * * * for the purpose of hindering, delaying, or interfering with or injuring any lawful business or enterprise of another.” The federal Supreme Court reversed the conviction, holding that such regulation was unconstitutional.
In the case of Carlson v. California, 310 U. S., 106, 84 L. Ed., 1104, 60 S. Ct., 746, decided the same day as the Thornhill case, the court declared invalid a municipal ordinance which broadly prohibited picketing. In that case, the court said: *556 be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgement by a state.” See, also, Milk Wagon Drivers Union of Chicago v. Meadowmoor Dairies, Inc., Co., 312 U. S., 287, 85 L. Ed., 836, 61 S. Ct., 552, 132 A. L. R., 1200; American Federation of Labor v. Swing, 312 U. S., 321, 85 L. Ed., 855, 61 S. Ct., 568; Bakery & Pastry Drivers & Helpers Local 802 v. Wohl, 315 U. S., 769, 86 L. Ed., 1178, 62 S. Ct., 816; Carpenters & Joiners Union of America v. Ritter’s Cafe, 315 U. S., 722, 86 L. Ed., 1143, 62 S. Ct., 807.
*555 “* * * publicizing the facts of labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner must now
*556 Suddenly, the view of the federal Supreme Court seemed to change to a recognition of rights in certain instances which would warrant an injunction against picketing or bannering notwithstanding the constitutional protection of free speech. On May 8, 1950, the Supreme Court decided three cases, Building Service Employees Intl. Union, Local 262, v. Gazzam, 339 U. S., 532, 94 L. Ed., 1045, 70 S. Ct., 784; Hughes v. Superior Court, 339 U. S., 460, 94 L. Ed., 985, 70 S. Ct., 718; International Brotherhood of Teamsters Union, Local 309, v. Hanke, 339 U. S., 470, 94 L. Ed., 995, 70 S. Ct., 773, which dealt with vital phases of this question and which indicated a distinct departure from the view taken in the Senn, Thornhill and Carlson cases.
In the Hughes case, above cited, an organization demanded that a store owner hire negroes as replacement clerks for white clerks who quit their employment, until the proportion of negro to white employees was equal to the proportion of negro to white customers. Upon refusal of the store owner to comply with the demand, his store was picketed. The pickets disregarded an injunction restraining their activities. In' contempt proceedings they were found guilty and they *557 appealed on the ground of deprivation of liberty guaranteed by the Fourteenth Amendment. The Supreme Court of California upheld the conviction and the federal Supreme Court affirmed. Mr. Justice Frankfurter, delivering the majority opinion, observed that “picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent.”
In the Hanke ease, above cited, Hanke and his sons operated a secondhand automobile sales lot as a partnership. Hanke, being a member of the teamsters union, had formerly operated the sales lot himself and had displayed at his place of business his union card and continued, to display it after operating the business as a partnership. The partnership refused to comply with closing hours fixed by the union and surrendered its union shop card, whereupon a picket was stationed in front of the place of business, during the business hours not approved by the union, carrying' a sign bearing the legend, “Onion people look for the union shop card.” The business of the partnership fell off and union drivers for supply houses refused to deliver parts and other materials. An injunction against the picketing was granted and damages in the sum of $250 was allowed. The. Supreme Court of Washington affirmed (33 Wash. [2d], 646, 207 P. [2d], 206) and its judgment was affirmed by the federal Supreme Court, four justices concurring in the opinion, one other in the result, three dissenting and one not participating. The opinion was written by Mr. Justice Frankfurter in which he said:
“Does the Fourteenth Amendment of the Constitution bar a state from use of the injunction to prohibit the picketing of a business conducted by the owner himself without employees in order to secure compliance by him with a demand to become a union shop?” The court answered the query in the negative *558 and held that, “while picketing has an ingredient of communication, it cannot dogmatically be equated with the constitutionally protected freedom of speech.”
Ho stated-also that the cause was admitted for review “to consider claims of infringement of the right of freedom of speech as guaranteed by the due process clause of the Fourteenth Amendment.”
In the course of his opinion the justice further said:
“The effort in the cases has been to strike a balance between the constitutional protection of the element of communication in picketing and the power of the state to set the limit of permissible contest open to industrial combatants. ’ ’
The court’s conclusion is clearly stated as follows:
“But when one considers that issues not unlike those that are here have been similarly viewed by other states and by the Congress of the United States, we cannot conclude that Washington, in holding the picketing in these cases to be for an unlawful object, has struck a balance so inconsistent with rooted traditions of a free people that it must be found an unconstitutional choice. Mindful as we are that a phase of picketing is communication, we cannot find that Washington has offended the Constitution.”
On June 4, 1951, the Supreme Court decided four cases which had to do primarily with the interpretation of the secondary-boycott provisions of the TaftHartley Act, but incidentally with picketing as a free-speech problem. Those cases are National Labor Relations Board v. International Rice Milling Co., Inc., 341 U. S., 665, 95 L. Ed., 1277, 71 S. Ct., 961; National Labor Relations Board v. Denver Bldg, & Construction Trades Council, 341 U. S., 675, 95 L. Ed., 1284, 71 S. Ct., 943; International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U. S., 694, 95 L. Rel., 1299, 71 S. Ct., 954; Local 74, United *559 Brotherhood of Carpenters & Joiners of America, v. National Labor Relations Board, 341 U. S., 707, 95 L. Ed., 1309, 71 S. Ct., 966.
In the Denver Bldg, & Construction Trades Council case, above cited, the labor union placed a picket on the construction job to force the general contractor to terminate his contract with one of his subcontractors who employed nonunion labor. It was shown that the union bylaws provided, in effect, that any union member must walk off the job when an authorized picket appeared. Upon the appearance of a picket, all the union men quit work or stayed away from work. The picket departed only after the contractor had discharged the nonunion subcontractor, whereupon normal operations were resumed. Upon appeal from a cease and desist order of the National Labor Relations Board, the United States Circuit Court of Appeals for the District of Columbia set aside the order •on the ground that there was no secondary boycott.
The cause was certified to the Supreme Court, which held, as stated in the L. Ed. headnotes:
“A strike of union men, employed by a general contractor in the construction of a building, which is instigated by a union with a view to inducing a subcontractor to employ union help, is a secondary boycott, since its object is to force the contractor to terminate the subcontract”; and the provisions of the TaftHartley Act to safeguard freedom of speech had no application because the picketing constituted a mere signal by a labor organization to its members, or to the members of its affiliates, to engage in an unfair labor practice such as a strike proscribed by the provisions of the Taft-Hartley Act as a secondary boycott.
The International Brotherhood of Electrical Workers case, above cited, also involved picketing on a construction job, the purpose of which was to secure *560 the discharge by the contractor of his subcontractor who employed nonunion workers. In that case, the union secured a work stoppage by peaceful picketing, rather than by a prearranged signal, and hence did not itself engage in or call the strike. In a six-fo-three decision, Mr. Justice Burton writing the opinion, the court sustained the order of the National Labor Relations Board to the effect that Section 8 (C) of the National Relations Labor Act, safeguarding freedom of expressing views, did not immunize peaceful picketing for an unlawful purpose and that the prohibition of such picketing carried no abridgement of the right of free speech. In the course of his opinion, Mr. Justice Burton, in discussing this issue of the case, said:
“The prohibition of inducement or encouragement of secondary pressure by section 8 (b) (4) (A) carries no unconstitutional abridgement of free speech. The inducement or encouragement in the instant case took the form of picketing followed by a telephone call emphasizing its purpose. The constitutionality of section 8 (b) (4) (A) is here questioned only as to its possible relation to the freedom of speech guaranteed by the First Amendment. This provision has been sustained by several Courts of Appeals [see National Labor Relations Board v. United Brotherhood of Carpenters & Joiners, 184 F. (2d), 60, 62; National Labor Relations Board v. Local 74, United Brotherhood of Carpenters & Joiners, 181 F. (2d), 126, 132, 16 A. L. R. (2d), 762; Printing Specialties & Paper Converters Union v. LeBaron, 171 F. (2d), 331, 334-355; United Brotherhood of Carpenters v. Sperry, 170 F. (2d), 863, 868, 869]. The substantive evil condemned by Congress in section 8 (b) (4) is the secondary boycott and we recently have recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives. There is no reason why Congress may not do likewise.”
*561 Court decisions now seem to firmly establish the rule that picketing or bannering as a means of the exercise of the right of free speech will be afforded constitutional protection so long as it is lawfully conducted, but if it becomes unlawful then it falls within the category of a civil wrong and must be governed by the law of torts. In other words, the constitutional guaranty of the right of free speech is predicated upon the lawful exercise of such right and if, through conspiracy or unlawful conduct, the result of its exercise unlawfully injures another in his property rights, the guaranty ceases and the exercise of the claimed right by such means may be enjoined or prohibited.
This brings us to a consideration of the character of the conduct of the defendants as affecting the plaintiff in the instant case. The plaintiff claims that the conduct of-the defendants was conspiratorial in character and constituted a secondary pressure or secondary boycott injuriously affecting it and, as such, was unlawful. A boycott may be defined in general terms as a concerted refrainment from business relations with another, or a concerted persuasion of third persons outside the combination to so refrain. It may be primary where there is a concerted refrainment from business relations with another, or by peaceful means a concerted inducement of others outside the combination to so refrain; or it may be secondary where there is not merely a concerted refrainment from business relations with the person against whom the boycott is directed or by peaceful means a concerted inducement of others outside the combination to so refrain, but an exercise of economic pressure upon such others to cause them to refrain from business relations with the person against whom the boycott is directed, through fear of loss or damage to themselves if they refuse to do so.
*562 In the case of International Brotherhood of Electrical Workers v. National Labor Relations Board, supra, the Supreme Court held, as stated in the L. Ed. headnotes:
“Picketing directed at a subcontractor’s employees to induce them to strike and thus force the subcontractor to force the general contractor to terminate a contract with another subcontractor, who employed nonunion men, is a secondary boycott.”
Likewise, in the instant case, the bannering of the construction site by the union for the purpose of inducing the union employees of the general contractor to cease work in concert with the further purpose of causing the general contractor to effect the discharge of a subcontractor or his subcontractor with whom the union has a labor dispute constitutes a secondary boycott. See Carpenters & Joiners Union v. Ritter’s Cafe, supra; Vonnegut Machinery Co. v. Toledo Machine & Tool Co. (Ohio), 263 F., 192; Central Metal Products Corp. v. O’Brien (Ohio), 278 F., 827; J. C. McFarland Co. v. O’Brien (Ohio), 6 F. (2d), 1016.
Although primary boycotts for legitimate purposes and without the employment of unlawful means are not actionable, an actionable boycott results if it is prosecuted through improper means or for illegal purposes. The common-law rule in a majority of the states of the union is that a secondary boycott in a labor dispute is unlawful and may be enjoined. The supreme test in determining the right to apply economic pressure is legality. The right to peacefully picket or banner is not free from limitation and does not extend beyond the bounds of legality.
The reasons for the legal distinction between primary and secondary boycotts that the latter are unlawful and enjoinable are that they constitute an unlawful interference with the rights of innocent third persons and of the rights of the public generally, and *563 that one not a party to industrial strife may not, against his will, be made an ally of either one of the parties for the purpose of accomplishing the destruction of the other. See Pacific Typesetting Co. v. International Typographical Union, 125 Wash., 273, 216 P., 358; Vonnegut Machinery Co. v. Toledo Machine & Tool Co., supra.
The rule in this state as to secondary boycotts, which, from a review of decided cases seems to have become a state policy, is summarized in 24 Ohio Jurisprudence, 676, Section 61, as follows:
“A secondary boycott is a combination not merely to refrain from dealing with a person, or to advise, or by peaceful means persuade, his customers to refrain from dealing with him, but to exercise coercive persuasion upon such customers, actually causing them to withhold or withdraw their patronage from him through fear of loss or damage to themselves. * * * The view now prevailing in most of the courts of this country is that the secondary boycott may not lawfully be employed in a labor dispute. And this is the view adopted by the majority of cases in Ohio.”
See Moores & Co. v. Bricklayers’ Union, 23 W. L. B., 48, 10 Dec. Rep., 665, affirmed, 51 Ohio St., 605, and cited in 90 F., 615, and 45 F., 135; and Crosby v. Rath, 136 Ohio St., 352, 25 N. E. (2d), 934, certiorari denied, 312 U. S., 690, 85 L. Ed., 1126, 61 S. Ct., 618, and 316 U. S., 688, 86 L. Ed., 1759, 62 S. Ct., 1278.
The judgment of the Court of Appeals is reversed and final judgment is rendered for the appellant.

Judgment reversed.

Weygandt, C. J., Stewart, Middleton, Taet and Matthias, JJ., concur.