LAFAYETTE DRAMATIC PRODUCTIONS, INC., *v.* FERENTZ.

1. APPEAL AND ERROR—DE NOVO REVIEW—CANCELLATION OF CONTRACTS—INJUNCTION.
  On appeal from decree dismissing bill to cancel a contract with a labor union and enjoin interference with plaintiff's business, the Supreme Court considers the case *de novo.*

2. MASTER AND SERVANT—LABOR DISPUTES—PUBLIC POLICY.
  The economic contest between employer and employee not only concerns the immediate disputants but also implicates the well-being of the community.

3. INJUNCTION—LABOR OBJECTIVES—COURTS.
  If the object sought to be obtained by labor unions was not a lawful labor objective, the court would be justified in exercising control of their acts, and it is for the court to determine whether or not the labor objective was lawful.

---

Illegal bargain in restraint of trade, see 2 Restatement, Contracts, §§ 514, 515; definition of and method of exercising duress, §§ 492, 493; duress by third persons, §§ 496, 497; effect of duress on transaction, §§ 494–496; remedy for duress, § 499.

4. CONSTITUTIONAL LAW—FREE ENTERPRISE.

    The right to enter into and conduct a legitimate business for profit has been and still is, except in time of war, a fundamental concept under the American doctrine of free enterprise.

5. THEATERS AND SHOWS—MUSICIANS—STAGEHANDS—UNIONS—INTERFERENCE WITH BUSINESS.

    The joint action of musician's union and stagehands' union in compelling theater operator to employ musicians which operator did not need or want in operating its theater constituted an interference with operator's conduct of a legitimate business.

6. INJUNCTION—INTERFERENCE WITH BUSINESS—UNLAWFUL LABOR OBJECTIVE.

    Purpose of conduct of musician's union in inducing stagehands' union to join in forcing theater operator to employ musicians it neither needed nor wanted or discontinue its theater and which had no dispute under its contract with stagehands' union was to accomplish an unlawful labor objective, since the objective invaded plaintiff's right to conduct its business without unjust interference and its right to the free flow of labor, hence such conduct could be enjoined.

7. MASTER AND SERVANT—UNIONS—STRIKES—PEACEFUL PICKETING—LABOR OBJECTIVES.

    While the right of two unions to strike and to do peaceful picketing may not be denied for purpose of accomplishing a legitimate labor objective, they may not combine for the purpose of using such lawful methods to obtain an unlawful labor objective.

8. SAME—UNIONS—COMBINATION TO FORCE EMPLOYMENT OF UNWANTED EMPLOYEES.

    Conduct of musician's union in inducing stagehands' union to join in a combination to force theater operator, which neither needed nor wanted musicians and which had no dispute under its contract with stagehands' union, either to employ musicians or to discontinue theater did not involve a labor dispute within meaning of act creating labor mediation board, hence such conduct could be enjoined (Act No. 176, Pub. Acts 1939).

9. INJUNCTION—UNIONS—LABOR DISPUTES.

    Unions may not claim that a bona fide labor dispute is involved in suit to set aside a contract and to enjoin unions' inter-

ference with plaintiff's business when the object they sought to accomplish was an unlawful labor objective (Act No. 176, Pub. Acts 1939).

10. SAME—CONSPIRACY—PEACEFUL PICKETING.

Peaceful picketing is unlawful when the object is in furtherance of a conspiracy to ruin a legitimate business.

11. CONTRACTS—DURESS.

The question as to what constitutes duress is a matter of law; but whether duress exists in a particular case is a question of fact.

12. WORDS AND PHRASES—DURESS.

Duress is compulsion or constraint by which a person is illegally forced to do or forbear some act by violence threatened which is such as to inspire a person of ordinary firmness with fear of serious injury to the person, reputation or fortune.

13. SAME—COERCION.

Coercion is the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.

14. SAME—MORAL DURESS.

Moral duress consists in imposition, oppression, undue unfluence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another; the theory under which relief is granted being that the party profiting thereby has received money, property or other. advantage, which in equity and good conscience he ought not to be permitted to retain.

15. CONTRACTS—LABOR UNION—BUSINESS COMPULSION.

Contract to employ unwanted and unnecessary musicians, signed by theater operator about two hours before theater in which it had made a very substantial investment was to open, as alternative of being unable to open theater because of threatened strike on part of his stagehands with whom operator had no dispute but which had combined with musicians' union to coerce and compel execution of contract, having been induced by duress, coercion and business compulsion, was void.

16. APPEAL AND ERROR—QUESTIONS REVIEWABLE—PLEADINGS.

Question as to right to recover salaries paid unwanted and unnecessary musicians pursuant to contract imposed upon theater operator by combination of musicians' and stage-

hands' unions, not having been raised by the pleadings, is not before Supreme Court for determination.

17. SAME—QUESTIONS REVIEWABLE—MOOT QUESTIONS.

In theater operator's suit to set aside contract to employ unwanted and unnecessary musicians, appeal is not dismissed on ground that contract has been performed and new one is in force and questions involved are moot where plaintiff alleges contract has been continued in force by duress and coercion, and case is of sufficient importance to warrant a decision by Supreme Court even though on record presented it might be considered moot and it may be in nature of a declaratory decree.

18. INJUNCTION—BLANKET RELIEF—RENEWAL CONTRACT OBTAINED UNDER DURESS.

Although theater operator's original one-year contract with musicians' union to employ unwanted and unnecessary musicians was void because obtained by duress, coercion and business compulsion and injunctive relief against acts and doings of defendant unions thereunder and blanket injunctive relief against any interference with operator's business will not be granted after performance and expiration of contract term before consideration on appeal, conclusions arrived at in holding original contract void would be applicable to renewal or further contract obtained under like circumstances.

Appeal from Wayne; Richter (Theodore J.), J. Submitted January 12, 1943. (Docket No. 89, Calendar No. 42,246.) Decided April 8, 1943. Rehearing denied June 7, 1943.

Bill by Lafayette Dramatic Productions, Inc., a Michigan corporation, against Jack Ferentz and others to have a contract decreed null and void and to restrain interference with plaintiff's operation of theater. Decree for defendants. Plaintiff appeals. Reversed.

*David I. Hubar* (*Milton M. Maddin,* of counsel), for plaintiff.

*Edward N. Barnard,* for defendants.

STARR, J. On December 6, 1941, plaintiff filed bill of complaint and on December 24th amended bill of complaint against defendants Jack Ferentz (also known as John S. Ferentz), Buddy Fields, Walter Craig, Roger Kennedy, Ray Showalter, Harry Leib, Detroit Federation of Musicians Local No. 5, A. F. of M. (in this opinion referred to as "musicians' union"), and Detroit Theatrical Protective Union Local No. 38 of the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators (in this opinion referred to as "stagehands' union"). In its amended bill plaintiff alleged, in substance, that it was a Michigan corporation organized for the purpose of operating the Shubert Lafayette theater in the city of Detroit; that it had spent large sums of money in rehabilitating such theater, in preparing for the presentation of theatrical productions and for the proposed theater opening October 13, 1941. Plaintiff alleged further that it had entered into a contract with defendant stagehands', union, in pursuance of which it had employed certain, named persons to work at the theater. It also alleged that several weeks prior to the opening of the theater defendants Buddy Fields, as business agent, and Jack Ferentz, as president of defendant musicians' union, called on plaintiff's manager and insisted that it employ an orchestra of six musicians and that it execute a written contract employing such musicians; that plaintiff's manager refused to execute such contract, informing defendants Fields and Ferentz that in its proposed presentation of plays plaintiff did not desire, require or intend to use any music and would not employ musicians. In its bill plaintiff further alleged, in sub-

stance, that about two hours before the proposed theater opening at 8:30 on the evening of October 13, 1941, defendants Fields and others, representing the musicians' union, defendant Showalter and others, representing the stagehands' union, and a representative of the International Alliance of Theatrical Stage Employees presented themselves at the theater office and notified plaintiff's manager that, unless he signed a written contract with defendant musicians' union to employ six musicians, they would not permit plaintiff's theatrical production to be presented; that such defendants notified plaintiff's manager that the musicians' union had combined with the stagehands' union to compel him to sign such contract; and that if the contract were not signed, plaintiff's employees who were members of defendant stagehands' union would immediately go on strike and refuse to render plaintiff services, which would prevent the presentation of the proposed theatrical production.

Plaintiff alleged further that, because of the duress exerted upon it by defendants and in order to protect its theater enterprise, its manager signed a written contract agreeing to employ six musicians in its theater. Plaintiff further charged that a conspiracy existed between defendant musicians' union, defendant stagehands' union, and their officers and employees, by coercion and duress to force your complainant to employ musicians which "it did not need or desire to employ;" that such procedure of coercion and duress was unlawful and did not involve a labor dispute or any controversy concerning the terms and conditions of employment; and that plaintiff would have sustained irreparable injury and damages if it had failed to present the proposed theatrical production on the opening night of October 13th. Plaintiff further alleged, in substance,

that following the signing of the contract its theater was opened and operated, and that the musicians rendered their orchestral services.  In its bill plaintiff prayed that the contract in question be vacated and set aside because obtained through duress and coercion; and also that defendants be enjoined from in any manner interfering with plaintiff's "peaceful and legal operation" of its theater because of its refusal to employ musicians.

Defendants answered, denying plaintiff's charges of duress and coercion and alleging that plaintiff "freely and voluntarily and without any fraud or coercion" entered into the contract in question; that a bona fide labor dispute existed between plaintiff and defendant musicians' union; that peaceful picketing is lawful; and that the court was without jurisdiction to enjoin the same.  Defendants denied plaintiff's right to the relief sought and asked that its bill of complaint be dismissed.

At the trial plaintiff called as witnesses only its manager, Mr. Nederlander, and its attorney, Mr. Hubar, who testified in support of the allegations in plaintiff's bill and regarding their interviews and negotiations with defendants and their representatives.  Defendants presented no testimony except that of a representative from the county clerk's office who testified relative to the incorporation of plaintiff corporation.  The trial court's opinion, filed May 19, 1942, determined that a "labor dispute" was involved; that the contract in question was free from duress or coercion and was valid; and that plaintiff's bill of complaint should be dismissed.  Such opinion stated in part:

"By Act No. 176, § 2 (b), Pub. Acts 1939 (Comp. Laws Supp. 1940, § 8628-2, Stat. Ann. 1942 Cum. Supp. § 17.454[2]), it is provided that:

" '(b) That terms "dispute" and "labor dispute"

shall include but are not restricted to any controversy between employers and employees or their representatives as above defined, concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining or changing terms or conditions of employment;' * * *

"Upon the authority of that case (*Lauf* v. *E. G. Shinner & Co.*, 303 U. S. 323 [58 Sup. Ct. 578, 82 L. Ed. 872]), I find that, irrespective of the fact that plaintiff in the instant case did sign a contract with one of the defendant unions in this case, a labor dispute or controversy existed in this case.

"And obviously if the contract in this case is valid and binding, that contract itself presents a labor controversy of the highest order. This brings us to the question whether for duress or coercion claimed by plaintiff the contract should be declared void.

"Although the Michigan Supreme Court has recognized that duress may be of property as well as of person, it is likewise well settled that mere necessitous circumstances do not constitute duress or coercion and cannot be made the grounds for cancellation of a contract made under such circumstances. * * *

"In the instant case the plaintiff is a corporation and its affairs and the execution of the contract here involved were handled by experienced business men. I find that the parties acted at arm's length in the execution of this contract and that there was no coercion or duress in the making thereof."

The decree entered May 29, 1942, determined that the contract in question for the employment of musicians was "valid and binding upon the parties" and dismissed plaintiff's bill of complaint. Plaintiff appeals from such decree. This being a chancery case, we consider the same *de novo*.

We recognize that the questions presented on this

appeal for our decision are far-reaching and of vital importance to the best interests of unions of employees, to employers, and to the general public. In the case of *Carpenters & Joiners Union of America, Local No. 213,* v. *Ritter's Cafe,* 315 U. S. 722, 724 (62 Sup. Ct. 807, 86 L. Ed. 1143), the majority opinion stated in part:

"The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest."

There is no dispute as to the material facts. The testimony adduced by plaintiff stands undisputed. Plaintiff corporation was organized in April, 1941, for the purpose of rehabilitating and operating the Shubert Lafayette theater. Plaintiff's manager, Mr. Nederlander, testified in substance that companies or individuals resident in New York City owned plaintiff corporation, that "they put the money up" and that it was "really a New York enterprise." In conversations with plaintiff's manager and attorney, certain of the defendants indicated, in effect, that plaintiff corporation was organized and conducted for the purpose of continuing certain labor disputes originating in New York City between theater owners and organized unions of musicians. However, the record discloses no facts regarding the organization, financing or management of plaintiff corporation which would materially affect the substantive rights of the parties involved in the present litigation.

Prior to the proposed opening on October 13, 1941, plaintiff had spent more than $10,000 in refurnishing and rehabilitating the theater and in advertising its opening and productions. It proposed to produce dramas and comedies, and its manager testified that for the production of such attractions it did not require musicians. Plaintiff had entered into a contract with defendant stagehands' union and had employed stagehands and others who were members of such union. The record indicates that there was no dispute regarding wages or working conditions between plaintiff and defendant stagehands' union or its members employed by plaintiff.

Several weeks prior to the proposed theater opening defendant Ferentz, president, and defendant Fields, business agent, of defendant musicians' union, each called on plaintiff's manager regarding its employing musicians. Plaintiff's manager informed both Fields and Ferentz that dramas and comedies would be produced at the theater; that such type of production did not require music; and that plaintiff would not employ musicians. Later defendant Fields again called on plaintiff's manager and left a proposed form of contract for the employment of musicians. As the interviews between plaintiff's manager and certain of defendants during the several weeks immediately preceding and on the night of the theater opening are of vital importance in determining the validity of the contract in question and whether or not defendants were endeavoring to accomplish a lawful labor objective, we shall quote at some length the undisputed testimony of plaintiff's witnesses. Mr. Nederlander, plaintiff's manager, testified in part:

"In answer to my statement that I did not want to hire any musicians because of the type of attractions that we were producing, he (defendant Fields)

said, 'You know, the Cass theater has to have an orchestra, and the Wilson theater has to have an orchestra, and I don't see how we could make any differential as far as this theater is concerned.' 'Well,' I said, 'I know, but we don't get any musical shows; we don't have any occasion to use them (musicians), and I am not going to put them in.' * * *

"Mr. Ferentz (defendant) came around again, and wanted to know if I hadn't changed my mind. I told him, 'No.' * * *

"When Mr. Fields brought me in the contract, and left it with me, and I told him that I didn't propose to sign it, I said, 'I want the privilege of appearing before the (union) board, and stating my case.' * * *

"I told the board that I was trying to open up this theater, but the type of attractions that we were going to have didn't warrant having any musicians, and we couldn't afford it. * * *

"I tried to talk them into seeing if we could only hire three musicians. * * * They said, 'No, because of the fact that the other theaters were required to handle six, we would have to be in the same class they were.' * * * This second meeting took place approximately a week before we opened. * * *

"On the day of the opening of the theater (October 13, 1941), I was visited by a delegation, and among them was Buddy Fields (defendant), and somebody else from the musicians' union; * * * and the stagehands' delegate was also there; there was also Roger Kennedy, who is the head of the motion picture operators, at the same time identified with the stagehands' union. * * * In addition to Buddy Fields, Walter Craig, Roger Kennedy, and Ray Showalter, there were several others. * * *

"I would say they came in probably at six or a little after. * * * We were up in my office. Mr. Hubar (plaintiff's attorney) and I were sitting

there. Mr. Fields was the one that done all the talking. He says, 'You know, I am up here because we've got to have a contract for this theater for the musicians.' He says, 'If you don't sign a contract, why you won't have any show tonight.' I said, 'Now just a minute,   *   *   *   you know I have a contract with the stagehands; I have no trouble with them, and I explained to you that we had no need for these musicians, and I am not going to put them in.'

"He said, 'I am sorry, but you won't have any show if you don't sign that contract.' And, we talked pro and con till about, I would say seventhirty or a quarter to eight when we were ready to open the doors, and when I saw the attitude they took, I says, 'Well, I suppose I will have to sign this contract.'   *   *   *

"I finally signed the contract.   *   *   *

"At this conversation on the day on which the theater opened, Mr. Kennedy told me, 'You know that the stagehands and the motion picture operators are affiliated, and we couldn't afford to have any of our men cross the picket line.'

"I paid the musicians' union, and the members of it, so far as they were used in my show, $450 a week, under protest.   *   *   *

"It is not a fact that we (plaintiff) have been deliberately hired by the booking agency of the Shuberts in New York for the purpose of renting and getting this house to try to break up and fight the musicians' union. In the 24 weeks since the opening of the theater on October 13, 1941, each member of this orchestra has received pay for eight weeks during which the house has been open, making a total of $560 for each member or approximately $24 per week average over the total period of 24 weeks.   *   *   *

"There are two other theaters that play legitimate drama, and comedy in Detroit. One of them is the Cass, the other is the Wilson. Both of those have orchestras supplied by the musicians' union."

The contract signed by plaintiff provided for the employment of six musicians as a theater orchestra for a one-year period, fixed the hours of work and the compensation to be paid, and also provided for arbitration in case of disagreement. Plaintiff's attorney, who was present at the interview between plaintiff's manager and certain of the defendants and others on the evening of the theater opening, testified in part:

"Mr. Fields  *  *  *  stated to Mr. Nederlander that they were there to find out whether or not he was going to sign this contract that had previously been submitted to him. He (Nederlander) said, 'Why, no. We don't intend to run anything here that calls for musicians. Our policy doesn't need musicians here, and we don't want them.'  *  *  * Mr. Fields started arguing, 'Why, we can't make any exception to your theater.  *  *  *  We can't disrupt the policy that the union has laid down here in the city of Detroit.  *  *  *

"It wrangled back and forth like that, I will say, about 20 minutes.  *  *  *  Mr. Nederlander turned to Roger Kennedy (of stagehands' union) and says, 'Roger, what have you got to do with this? I have got a contract with the stagehands.' And Mr. Kennedy says, 'Well, the musicians' union has called on the International for assistance, and we can't help it, we must give it to them.  *  *  *

" 'We are affiliated through some international connection and tieup with the musicians, and since the American Federation has called on us to assist, go on a sympathetic strike if they want it, we are going to go.'  *  *  *

"I started a long discussion with Mr. Fields, how this matter could be taken up with the International. He said, 'You always have your privilege, but in the meantime we have got to have the contract. If we don't have a contract signed before we leave this room, we are going to call a strike and your show

don't go on.' And at the time he was discussing, they had pickets waiting on the outside of the theater, ready to start parading around the theater if he didn't come out with a contract.

"It got on then to about 7:30. * * * We knew the show had to open at 8:30. I turned to Mr. Nederlander and said, * * * 'They have got you in a pocket here. You are either going to sign a contract or not going to have a show.' "

As hereinbefore stated, there was no dispute between plaintiff and defendant stagehands' union regarding wages or conditions of employment. In conversations and by letter defendant musicians' union and its representatives repeatedly insisted that plaintiff employ at least six musicians. As shown by the above-quoted testimony, the situation reached a climax about two hours before the proposed theater opening. At that time the defendants stagehands' union and the musicians' union combined in demanding that plaintiff sign a contract employing such musicians; and as a means of forcing such demand upon plaintiff the stagehands' union threatened to call an immediate strike of its members employed by plaintiff. It is apparent that if such strike had been called, the theater could not have opened that evening and the proposed theatrical production, for which all arrangements had been made, could not have been given. Further to enforce their demand that plaintiff sign the contract, defendant unions threatened to picket plaintiff's theater immediately. At such conference on the evening of the theater opening defendant Fields said:

"We've got to have a contract for this theater for the musicians. * * * If you don't sign a contract, why you won't have any show tonight. * * * If we don't have a contract signed before

we leave this room, we are going to call a strike (of plaintiff's employees who were members of defendant stagehands' union) and your show don't go on.''

Under such duress and compulsion plaintiff's manager signed the contract with defendant musicians' union. The record indicates that such musicians thereafter performed as a theater orchestra and were paid by plaintiff. The testimony shows that plaintiff intended to produce dramas and comedies and did not require or want an orchestra, and that its theater operation did not warrant the expense of an orchestra. The only reasons advanced by defendants for requiring plaintiff to employ musicians were that it would furnish work to unemployed musicians; that two other theaters in Detroit had signed like contracts; and that the union would not make an exception as to plaintiff. Plaintiff's manager testified:

''Mr. Ferentz told me that they couldn't make an exception in my case, when the Wilson and the Cass (theaters) had to employ six men for the rendition of their music.  *  *  *  He told me that theaters went by classes, that we were all in what we call legitimate plays, rather than movies. He said that we would have to abide by the same rules and regulations that would govern the Cass and the Wilson.''

By threatening to prevent the opening and operation of the theater defendant unions sought to compel plaintiff to sign a contract for the employment of musicians which it did not need or desire to employ and could not afford. Defendants' only objective was to compel the employment of such musicians. The question is, was this a lawful labor objective?

It is plain that defendants' demand that plaintiff employ musicians had no reasonable connection with

any dispute or controversy relating to wages, working conditions, hours of work, health, safety, the right of collective bargaining or the protection of labor from abuses. The situation did not involve any dispute between plaintiff and members of defendant musicians' union or between plaintiff and members of defendant stagehands' union regarding wages, working conditions or regarding other legitimate controversial labor matters. The situation involved only the question of the right of the defendant unions to combine their efforts for the purpose of compelling plaintiff either to employ an orchestra it did not need or want or to submit to a strike of its employees, which would have prevented the opening and operation of its theater. If the object sought to be obtained by defendants was not a lawful labor objective, the court would be justified in exercising control of their acts. Furthermore, it is for the court to determine whether or not the labor objective was lawful.

The right to enter into and conduct a legitimate business for profit has been and still is, except in time of war, a fundamental concept under our American doctrine of free enterprise. *Truax* v. *Corrigan,* 257 U. S. 312 (42 Sup. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375); *Dorchy* v. *Kansas,* 272 U. S. 306 (47 Sup. Ct. 86, 71 L. Ed. 248). In the present case defendants have interfered with plaintiff's conduct of a legitimate business.

The question presented is whether or not the objective sought by defendants, which was to compel plaintiff to employ musicians, and the means used in obtaining such objective were lawful.

A situation somewhat similar to that involved in the present case was considered in *Opera on Tour, Inc.,* v. *Weber,* 285 N. Y. 348 (34 N. E. [2d] 349, 136 A. L. R. 267); certiorari denied, 314 U. S. 716 (62

Sup. Ct. 477, 86 L. Ed. 570). In that case plaintiff
was engaged in the business of giving performances
of grand opera with an orchestral accompaniment
of recorded music mechanically reproduced. The
defendants were a labor union of musicians and a
labor union of theatrical stage employees. The
musicians' union demanded that plaintiff employ an
orchestra of musicians and threatened to stop plain-
tiff's presentations by causing the members of the
stage employees' union to refuse to serve plaintiff
in connection with its performances unless it em-
ployed musicians. The complaint in such case al-
leged that the defendant unions conspired to coerce
the plaintiff to employ musicians. In an opinion
sustaining an injunction against defendants, granted
by the lower court, it was stated, pp. 352–360:

"The only issue is whether the leaders of the de-
fendant unions were engaged in promoting a lawful
labor objective when the musicians' union induced
the stagehands' union to join in a combination to
destroy an enterprise solely because of the use of
machinery in the production of music in place of the
employment of live musicians. * * *

"Individually and collectively, the members of any
union may at any time refuse to work, because ma-
chinery is employed or for any other reason, and
may strike in so doing. The members of these
unions are free to refuse to work if they object to
working in the presence of a machine. *But what is
here enjoined is the inducement by the musicians'
union of the stagehands' union to enter into a com-
bination to destroy the business of the plaintiff
solely because machinery instead of live musicians
is used.* Here the members of the stagehands' un-
ion were ordered and coerced to leave the employ
of the plaintiff, causing the ruin of plaintiff's busi-
ness. * * * This, even though the members of
the stagehands' union were not dissatisfied with

respect to wages, hours or terms and conditions of their employment, and no controversy existed or exists between them and plaintiff.  *    *    *

"In addition, the defendant musicians' union ordered that no member of that union render services to plaintiff, and caused  *   *   *  members of the stagehands' union not to accept' employment from plaintiff. If they had not been so ordered, the members of the defendant stagehands' union would have continued to render services to plaintiff. As a result of this conspiracy between the two defendant unions, plaintiff was unable to fulfill its bookings and its contracts which had already been made and was prevented from entering into further engagements for the presentation of opera, and in consequence thereof this entire enterprise was forced to come to a complete stop.  *    *    *

"Does this demand of these defendant unions, that plaintiff discard machinery in the interest of the immediate employment of a few individuals, *constitute a lawful labor objective*? If the acts of these unions have any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment or for the protection from labor abuses, then the acts are justified. (*National Protection Association of Steam Fitters & Helpers* v. *Cumming,* 170 N. Y. 315 [63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648]; *Bossert* v. *Dhuy,* 221 N. Y. 342 [117 N. E. 582, Ann. Cas. 1918 D, 661]; *J. H. & S. Theatres, Inc.,* v. *Fay,* 260 N. Y. 315 [183 N. E. 509]; *Goldfinger* v. *Feintuch,* 276 N. Y. 281 [11 N. E. (2d) 910, 116 A. L. R. 477]; *May's Furs & Ready-to-Wear, Inc.,* v. *Bauer,* 282 N. Y. 331 [26 N. E. (2d) 279]; *Baillis* v. *Fuchs,* 283 N. Y. 133 [27 N. E. (2d) 812].) If on the other hand the labor objective here sought is illegal and not a lawful labor objective, since it has no reasonable connection with wages, hours, health, safety, the right of collective bargaining, or any other condition of employment or for the

protection of labor from abuses, then there is no immunity for injury inflicted by a labor union. * * *

"When the labor objectives are illegal, the courts must control, otherwise there are bodies within our midst which are free from the provisions of the penal law. When doubt arises whether the contemplated objective is within the legal sphere, or without and so illegal, it is for the courts to determine. * * *

"To make impossible the continuance of a business and thus to prevent the employment of a full complement of actors, singers and stagehands merely because a machine is not discarded and in place thereof live musicians employed, is not a lawful labor objective. * * *

"Since the endeavor to prevent the use of a mechanical device bears no reasonable relation to wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment or for the protection of labor from abuses, there is no labor dispute within either the letter of the spirit of the civil practice act. (Civ. Prac. Act, § 876–a, subd. 10 (N. Y. Laws of 1920, chap. 925, § 876a, subd. 10, as added by Laws of 1935, chap. 477 [see, also, 29 McKinney's Consol. Laws, § 753a]); *Thompson* v. *Boekhout,* 273 N. Y. 390 [7 N. E. (2d) 674]; *Luft* v. *Flove,* 270 N. Y. 640 [1 N. E. (2d) 369]). * * *

"The leaders of a labor union cannot make an illegal objective legal merely by the use of a legal method (the strike) to obtain that objective."

In the case of *Haverhill Strand Theater, Inc.,* v. *Gillen,* 229 Mass. 413 (118 N. E. 671, L. R. A. 1918 C, 813, Ann. Cas. 1918 D, 650), the plaintiff, who operated a moving picture and vaudeville theater, employed one musician who played an organ in the theater. The defendants were officers and members of a labor union of musicians. The union of mu-

sicans adopted an arbitrary rule under which plaintiff was required to employ an orchestra of five musicians. Defendants notified plaintiff that they intended to enforce such rule, and plaintiff filed bill in equity to enjoin such enforcement. In sustaining an injunction against enforcement of the rule the court said in part, pp. 418–421:

"It is manifest that such a rule is an interference with a plaintiff's right to that free flow of labor to which every member of the community is entitled for the purpose of carrying on the business in which he or it has chosen to embark.  *  *  *  In the case at bar the purpose of the defendants' combination is to force the plaintiff to make work for them when he does not wish to have that work done and when that work will result in a pecuniary loss to him. The question is whether a combination by a union for the purpose of getting work for the members of it in this indirect way is a justifiable interference with the plaintiff's right to a free flow of labor.  *  *  *

"A majority of the court are of opinion that a minimum rule fixing the number of musicians to be employed in the several theaters specified in it is an interference with the right of the owners of those theaters to a free flow of labor which is not justified by the purpose for which it is made."

In the case of *Thompson* v. *Boekhout*, 273 N. Y. 390 (7 N. E. [2d] 674), the court granted an injunction restraining defendants from picketing because plaintiff had decided to operate his theater without help. In a *per curiam* opinion the court said:

"Where the owner of a small business seeks to avoid 'labor disputes' as defined in the statute, by running his business without any employees, an attempt to induce or coerce him to hire an employee

or employees, upon terms and conditions satisfactory to persons associated in such attempted inducement or coercion is not a 'labor dispute' within the letter or spirit of the statutory definition."

For other authorities on the question of labor objectives" and "labor disputes" see *Pitter* v. *Kaminsky,* 7 N. Y. Supp. (2d) 10; *Scavenger Service Corp.* v. *Courtney* (C. C. A.), 85 Fed. (2d) 825; *Aikens* v. *Wisconsin,* 195 U. S. 194 (25 Sup. Ct. 3, 49 L. Ed. 154); *Wohl* v. *Bakery & Pastry Drivers & Helpers Local 802 of the International Brotherhood of Teamsters,* 284 N. Y. 788 (31 N. E. [2d] 765); reversed 315 U. S. 769 (62 Sup. Ct. 816, 86 L. Ed. 1178); *Carpenters & Joiners Union of America, Local No 213,* v. *Ritter's Cafe, supra; Thornhill* v. *Alabama,* 310 U. S. 88 (60 Sup. Ct. 736, 84 L. Ed. 1093); *Senn* v. *Tile Layers Protective Union,* 301 U. S. 468 (57 Sup. Ct. 857, 81 L. Ed. 1229); *Dorchy* v. *Kansas, supra.*

In the present case defendants' objective was to compel plaintiff to employ musicians which it did not need or desire. Such objective invaded plaintiff's right to conduct its business without unjust interference and its right to the free flow of labor. In the case of *Opera on Tour, Inc.,* v. *Weber, supra,* the musicians' union induced the stagehands' union to join in a combination to force plaintiff either to employ musicians or to discontinue its theatrical business. In the present case defendant musicians' union induced defendant stagehands' union to join in a combination to force plaintiff either to employ musicians or to discontinue its theater. We are satisfied that defendants' purpose was to accomplish an unlawful labor objective.

In effect, defendants argue that the stagehands' union and the musicians' union had the right to

strike and to do peaceful picketing. We do not deny them that right in the accomplishment of a legitimate labor objective. However, we do deny them the right to combine for the purpose of using such lawful methods to obtain an unlawful labor' objective. *Opera on Tour, Inc.,* v. *Weber, supra.*

Defendants contend, and the trial court held, that the present case involved a labor dispute within the meaning of Act No. 176, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 8628–1 *et seq.,* Stat. Ann. 1942 Cum. Supp. § 17.454 [1] *et seq.*), being an act to create a board for the mediation of labor disputes. By such contention defendants apparently sought to bring the matter under the jurisdiction of the State labor mediation board. Relying upon *Lauf* v. *E. G. Shinner & Co.,* 303 U. S. 323 (58 Sup. Ct. 578, 82 L. Ed. 872), the trial court held that a "labor dispute or controversy" was involved in the present case. The question in the *Lauf Case* was whether or not the factual situation presented constituted a labor dispute within the terms of Wisconsin Statutes 1937, § 103.62 (3). In defining the term "labor dispute" such statutory provision was much more comprehensive than the corresponding provision of our State statute cited above, in that it also provided "or any other controversy arising out of the respective 'interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee." The *Lauf Case* is not determinative of the question before us. We are convinced that the present case does not involve a labor dispute within the meaning of our State statute. Furthermore, defendants may not claim that a bona fide labor dispute is involved when the object they sought to accomplish was an

unlawful labor objective. In *Dorchy* v. *Kansas, supra,* Mr. Justice Brandeis said, p. 311:

"A strike may be illegal because of its purpose, however orderly the manner in which it is conducted."

See, also, *Thompson* v. *Boekhout, supra; Luft* v. *Flove,* 270 N. Y. 640 (1 N. E. [2d] 369); *Opera on Tour, Inc.,* v. *Weber, supra; Haverhill Strand Theater, Inc.,* v. *Gillen, supra.*

In *Scavenger Service Corp.* v. *Courtney, supra,* where the employees' union and the employers' association combined to prevent the complainant from entering into the scavenger business, it was held that the unlawful end made the means also unlawful. The court there said, p. 833:

"The conspiracy was one to ruin appellant's business. Therefore the means adopted were unlawful. The actionable character of the means may be and often is determined by the use to which they are put. If, therefore, individuals conspired to commit the wrongful act of ruining appellant's business, the means, even though of themselves innocent, were actionable. Aside from whether the picketing was peaceful, * * * it was unlawful when its object was as here disclosed."

Plaintiff contends, in substance, that it was compelled by duress and coercion to enter into the contract in question for the employment of musicians and asks that such contract be vacated and set aside. Defendants contend, and the trial court determined, that there was no duress or coercion in connection with the execution of such contract. The trial court said that plaintiff's affairs and the execution of the contract "were handled by experienced businessmen, * * * that the parties acted at arm's

length.'' It is clear there was no duress of person but rather a duress of business or property, which in some cases has been described as business compulsion. The question as to what constitutes duress is a matter of law, but whether duress exists in a particular case is a question of fact. *Clement* v. *Buckley Mercantile Co.*, 172 Mich. 243. Duress and coercion are defined in Webster's New International Dictionary (2d Ed.) as follows:

''Duress. Compulsion or constraint by which a person is illegally forced to do or forbear some act. This may be by * * * violence threatened. * * * The violence or threats must be such as to inspire a person of ordinary firmness with fear of serious injury to the person, * * * reputation, or fortune.''

''Coercion. The application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.''

In *Hackley* v. *Headley*, 45 Mich. 569, Mr. Justice Cooley said, p. 574:

''Duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will. It is commonly said to be of either the person or the goods of the party.''

In the case of *Rees* v. *Schmits*, 164 Ill. App. 250, the court said, p. 258:

''Moral duress consists in imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another; the theory under which relief is granted being that the party profiting thereby has received money, property or

other advantage, which in equity and good conscience he ought not to be permitted to retain.''

See, also, *Illinois Merchants' Trust Co.* v. *Harvey,* 335 Ill. 284 (167 N. E. 69) ; *Dana* v. *Kemble,* 17 Pick. (34 Mass.) 545; *Brown* v. *Worthington,* 162 Mo. App. 508 (142 S. W. 1082) ; *Duke* v. *Force,* 120 Wash. 599 (208 Pac. 67, 23 A. L. R. 1354) ; *Snyder* v. *Rosenbaum,* 215 U. S. 261 (30 Sup. Ct. 73, 54 L. Ed. 186).

In the present case it appears that about two hours before plaintiff's theater was to open, its manager was confronted with the emergency of either acceding to defendants' demand that he sign a contract employing musicians or submit to a strike by plaintiff's employees who were members of defendant stagehands' union, which strike would make it impossible for him to open or operate the theater. There was no dispute between plaintiff and the stagehands' union which was acting in combination with defendant musicians' union to coerce and compel the execution of the contract. Plaintiff had made a very substantial investment in preparation for the opening of its theater, and its manager was faced with the necessity of deciding immediately whether to sacrifice such investment or to sign a contract employing unwanted and unnecessary musicians. We are convinced that under the facts and circumstances shown by the record plaintiff's manager was induced by duress, coercion, and business compulsion to sign the contract in question. Plaintiff acted with due diligence in beginning the present suit, and such contract should be set aside and vacated.

The cases of *Baldwin* v. *Village of Chesaning,* 188 Mich. 17 (Ann. Cas. 1918 B, 512) ; *Clement* v. *Buck-*

*ley Mercantile Co., supra; Cicotte v. County of Wayne,* 59 Mich. 509; and *Hackley v. Headley, supra,* do not sustain defendants' contention that there was no duress or coercion in connection with the execution of the contract in question.

In its brief, by implication, plaintiff raises the question as to its right to recover the salaries it paid to the musicians employed under the contract. Such question was not raised by the pleadings and is not before us for determination.

During the pendency of this appeal defendants filed motion in this court to dismiss the appeal, alleging that the contract for the employment of musicians for the period of one year had been fully performed and that the questions involved had, therefore, become moot. In such motion defendants further alleged in substance that the parties had entered into a new contract that was being amicably fulfilled. Plaintiff filed answer to such motion, denying that the questions regarding the validity of the contract have become moot and in substance alleging that plaintiff has been forced by duress and coercion to continue the contract in question for a further period of time.

We have before us on this appeal only the questions relating to the original or first contract for one year. Notwithstanding such questions and the issues presented by this record might be considered moot, we deem the case of sufficient importance to warrant our decision, even though it may be in the nature of a declaratory decree.

In its bill of complaint plaintiff asks for injunctive relief against any interference with its business by the defendants. We are not disposed to grant such blanket type of injunction against all interference. Nor should we grant injunctive relief against the acts and doings of defendants in compel-

ling plaintiff to execute the original contract for one year, as such period has expired and the contract has apparently been performed.

The questions or issues as to the validity of the claimed renewal or extension contract, and as to plaintiff's right to injunctive relief in connection with such renewal or extension, have not been determined by the trial court and are not before us under the record on this appeal. However, our conclusions and what we have said in this opinion would be equally applicable to any renewal or further contract obtained through similar means and under like facts and circumstances.

The decree of the trial court is reversed. A decree may be entered in this court declaring the contract in question to be null and void. Plaintiff shall recover its costs.

BOYLES, C. J., and CHANDLER, NORTH, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.