**CONSTRUCTION & GENERAL LABOR UNION LOCAL No. 688, et al. v. STEPHENSON.**

No. 5955.

Court of Civil Appeals of Texas. Amarillo.

April 4, 1949.

Rehearing Denied May 9, 1949.

Mullinax, Wells & Ball, Dallas, John H. Merchant and Jerome J. Pope, Amarillo, Leigh Fischer, Borger, for appellants.

E. Byron Singleton, Amarillo, for appellee.

STOKES, Justice.

Appellee, H. I. Stephenson, was engaged in the house-moving business at Amarillo and had been so engaged as an independent contractor for many years before he filed this suit against appellants. He maintained an organization consisting of a number of employees and paid them for their time when they were not engaged, as well as when they were engaged, in his work of moving houses in order to maintain the organization and be able at all times to perform such work when it was available. He testified that the work of moving houses was skilled labor and that men without experience in that particular work could not be relied upon to perform the many and varied duties which it entailed. On the 25th of February, 1948, he entered into a contract with the Commissioners' Court of Potter County under which he agreed to dismantle and move two large airplane hangers from Dalhart to Amarillo and re-erect them into an arena at the Tri-State Fair Grounds upon foundation and structural steel as furnished by the county. The work was to be completed within 150 working days for which appellee was to be paid the sum of $45,000. The contract provided that, if the work was not completed within the time specified, $25 per day would be deducted from any money due appellee for such additional days as were consumed in completing the contract. The work of dismantling the hangers, or cutting them into convenient sections, and transporting them to Amarillo was completed in September, 1948, at which time the re-erection, or putting them back together, began. The crew maintained by appellee and used in the work involved were not members of any labor union and there was no organized house-movers' union at Amarillo or otherwise available to them. In re-erecting the hangers at Amarillo it was necessary to lift to a height of about fifty feet and put in place fourteen steel trusses of approximately 18,500 pounds each, weld and bolt them together and attach them to other parts or the structure. Business agents of the local Iron Workers' Union requested appellee to hire skilled union men to perform this work. The request was declined by him and the agents and representatives of the unions and the council then suggested that the men employed by appellee as house-movers either organize themselves into a labor union or join the Iron Workers, Carpenters and other unions available. Appellee told them he had no objection to either of these plans and that he would assemble his employees so that the union agents could present the proposition to them. This was done, and the employees of appellee voted not to organize themselves into a union nor to join the other unions. Appellee testified that his employees usually performed all of the work necessary to

move a building from one place to another, and to re-assemble those buildings which were of such size as to require dismantling or were cut into sections in order to facilitate the work or make it possible to remove them properly. He said he and his employees had had experience in "rigging iron" or placing iron work in buildings, though he had never before done so in a building as large as this one.

Appellee paid his employees various wages, some of them receiving $1.15 per hour, others more. The union wage scale for those who performed regular work similar to some of that which was necessary for the re-erection of the building, such as carpenter work, heavy iron work, etc., was $2.00 per hour. In order to complete the re-erection of the hangers and convert them into an arena, it was necessary that certain carpenter work and welding be performed and, to do this work, which was not included in appellee's contract, union members were employed at the union scale of wages and paid by appellee, but he was reimbursed therefor by the commissioners' court.

The agents and representatives of the labor unions and the Amarillo Building and Construction Trades Council made a number of efforts to induce appellee either to employ union members or organize his employees into a labor union and, upon his refusal to do either, the Trades Council established a picket in the street adjoining the site of the re-construction. It consisted of one man who carried a banner containing this inscription

> "Amarillo Building and Construction Trades Council Protests the Employment by Ira Stephenson and Company of Non-Union Labor on This Job, and the Failure of the Employees on This Job to Join Unions Affiliated with Amarillo Building and Construction Trades Council."

The picketing was peaceful and consisted of one man walking to and fro near the building with the banner exposed. In addition to the picket, the Iron Workers' Union and the Amarillo Building Trades Council, in a regular meeting, adopted resolutions declaring appellee to be unfair to organized labor. When the picket was established, the labor unions and their officers informed the union carpenters and welders that they were violating the rules of the union by working upon a non-union job with men who were not members of any labor union. Some of them thereafter declined to perform further work but one of them who continued to work was cited to appear and show cause why he should not be disciplined for working on a job being erected by appellee by the use of non-union men. A trial by the Union resulted in a fine being assessed against him for thus violating the rules of the Unions and the Council. The picketing resulted in appellee's filing this suit for an injunction against the Amarillo Building Trades Council and the labor unions composing it, and for damages which appellee alleged he had suffered by reason thereof. In the trial of the case he waived his prayer for damages and requested the court to consider the evidence as to damages only as a basis for the injunction.

The case was submitted to the court, without the intervention of a jury, and resulted in a judgment in favor of the appellee, enjoining the appellants from picketing the premises closely adjacent to the erection of the arena and from congregating or assembling in the vicinity thereof; from placing banners or signs thereabout; from publicizing at or near the premises a protest respecting the appellee; and enjoining them from thereafter establishing a picket or pickets at or near the premises "unless at such time controversy then exists between plaintiff and the majority of his employees concerning wages, hours or conditions of employment, or a controversy exists between plaintiff and the majority of his employees belonging to any one labor union concerning wages, hours or conditions of employment." Obviously the judgment was based upon Article 5154f, Vernon's Revised Civil Statutes.

The court found that appellants, acting in concert, caused the picketing of the premises at a time when there was no controversy existing between appellee and any of his employees on any matter and none concerning wages, hours or conditions of employment; that the Iron Workers' Union

and the Trades Council went on record as finding appellee unfair to organized labor; that, at such time, neither of them nor any of their members were employees of appellee; and that S. B. Perry, who picketed the premises, was never an employee of appellee, but that he was a member of one of the labor unions. It further found that appellee had suffered damages at the time of the trial and that he would suffer further damages unless the injunction was issued.

Appellants duly excepted to the judgment and have brought the case here for review upon the contention that the injunction was improperly issued because it deprives them of their constitutional rights of free speech and free assembly. They contend that Article 5154f, V.R.C.S., Acts of 1947, 50th Legislature, p. 779, ch. 387, is unconstitutional in so far as it purports to authorize the issuance of an injunction in cases of this kind and that the purposes for which appellants picketed the premises were valid and lawful.

Section 1 of Article 5154f provides that it shall be unlawful for any person to establish, participate in, aid or abet a secondary picketing or a secondary boycott as defined in the article. Section 2, subd. d, defines the term "secondary picketing" as being the act of establishing a picket where no labor dispute exists between the employer and his employees. Section 2, subd. e, defines a secondary boycott as being any concerted action by two or more persons to cause injury or damage to any person for whom they are not employees by (2) picketing such person.

At the outset it will be observed that there is no interdependence of economic interests of those engaged in the same industry involved. As we have already said, there was no union of house-movers in Amarillo or vicinity and it is not a question here of non-union house-movers being employed by the appellee to whom he paid wages below the wage scale of any house-mover's union. The undisputed testimony showed that the work and labor of moving houses is an unusual occupation and that a man must be experienced in the matter of setting up and operating jacks, winches and other tools used in the operation. Appel-

lee testified that a man capable of driving a truck, for instance, would not be qualified as a house-mover if he knew nothing about any portion of that work other than operating a truck. He said there was winch-work and that the men had to know how to operate a winch in order to avoid injuring or destroying the structure being moved. He said further that some of his men had had experience in "rigging iron" before he employed them and that he gave special training to those who had not previously had experience as house-movers. All this sums up to the proposition that the occupation of house-moving is a recognized occupation or trade, the same as that of carpenter, iron worker, painter and the like. Indeed appellants recognized it as such when they suggested to appellee and to his employees that they organize themselves into a union. While it is true that some phases of house-moving involve work of the same nature as that of other trades and occupations, those phases nevertheless constitute a legitimate portion of the work ordinarily performed by house-movers. Being such, it cannot be said that, when it becomes necessary for them to perform those phases of the work of house-moving, they are engaged in the same industry as those who regularly perform such work as a trade or occupation and are known as iron workers, carpenters and the like and that there is involved, therefore, interdependence of economic interests. Carpenters & Joiners Union of America, Local No. 213 v. Ritter's Cafe, 315 U.S. 722, 60 S.Ct. 807, 86 L.Ed. 1143; American Federation of Labor v. Swing, 312 U.S. 321, 61 S Ct. 569, 85 L.Ed. 855; Bakery & Pastry Drivers and Helpers I.B.T. v. Wohl, 315 U.S. 769, 62 S. Ct. 816, 86 L.Ed. 1178.

Appellants contend there was a direct industrial connection or interdependence of economic interests between the unions and appellee's enterprise because appellee paid grossly sub-standard wages; that iron workers who, for a generation, have struggled to obtain a $2.00 per hour wage scale, have a close and intimate interest in seeing that an unfair employer, paying only $1.15 per hour, does not drive their wage scale down. We are unable to see any industrial connection or interdependence of economic

interest in this. As we have already shown, the work of hoisting and putting in place the iron trusses that was performed by appellee's employees did not necessarily place them in the class of skilled iron workers, nor does it necessarily follow that, in doing so, they forsook their trade or occupation of house-movers and became, for the time, iron workers. The work of hoisting the trusses and putting them in place was incidental to their trade or occupation as house-movers in the same sense as those of the same house-moving crew remained such when, incidental to their work, they drove and operated trucks. Although the Teamsters and Chauffeurs Union was a member of the Construction Trades Council and is a party to the suit, no contention is made that the status of those in appellee's crew who operated trucks thereby abandoned their occupation as house-movers and became teamsters or chauffeurs during the time they were so engaged.

■ All we have before us, then, is the question of whether or not there was a bona fide labor dispute existing between the appellants and the appellee. There is no contention that there was any sort of a controversy existing between the appellee and his employees and the record clearly shows there was none. The question of whether or not a labor dispute existed is limited, therefore, to the appellant labor unions and the appellee. The principle that there is a direct connection between peaceful picketing and the constitutional guaranty of free speech is well established by many decisions of the United States Supreme Court and the Supreme Court of this State. Thornhill v. State of Alabama, 310 U.S. 88, 69 S.Ct. 736, 84 L.Ed. 1093; Ex parte Henry, Tex.Sup., 215 S.W.2d 588; Northeast Texas Motor Lines v. Dickson, Tex.Sup., 219 S.W.2d 795. It is also established by those decisions and others that peaceful picketing is more than free speech; it is economic coercion as well. Where an actual, bona fide labor dispute exists, peaceful picketing at proper places and for lawful purposes cannot be enjoined, because it is an element of free speech and is protected by the First and Fourteenth Amendments of the Constitution of the United States.

■ If we should confine ourselves to the statute, Article 5154f, V.R.C.S., the case would end here because, under the statute, it is unlawful for any person to establish or participate in secondary picketing or boycott where no labor dispute exists between the employer and his employees. In as much as appellants contend that the entire article of the statute is unconstitutional, however, we shall extend the discussion to the question of a bona fide labor controversy vel non as between appellant labor unions and the appellee. Appellants contend in their brief that the picket was established in protest against appellee's payment of $1.15 wages as contrasted with the $2.00 wage under the union scale and in protest against the unsafe manner in which inexperienced, unqualified workers were erecting the steel. According to the inscription on the banner carried by the picket, the protest was two-fold. It protested, first, the employment by appellee of non-union labor on the job and, secondly, the failure of the employees on the job to join unions affiliated with the Amarillo Building and Construction Trades Council. None of the members of the appellant labor unions were employees of appellee nor, as far as the record shows, were they ever such. The unions were not directly concerned in any way with the work being carried on by the appellee and his crew of house-movers. No contract was in existence or had ever been made between the appellee and appellant labor unions or any of their members and no protest was made by any of them against unfair practices of appellee except that he was employing non-union labor and paying his employees for their services as house-movers a smaller wage for their work as such than that which was provided by the union scale of wages for their own members. We are unable to see any valid, bona fide labor dispute or controversy involved in this. Appellee had the right to engage in the business of moving houses and to employ non-union men if he wished to do so. We know of no rule of law that requires the employment of union labor or forbids the employment of those who are not members of a union. The only request ever made of appellee by appellants out of which a con-.

troversy could have developed was that his employees either form a union of their own or join various unions affiliated with the Trades Council. To this he readily consented and informed appellants' agents and representatives that he would let them know when his employees were together so that the agents could talk with them about it. He did this, and appellants' agents discussed the matter with appellee's crew and its members declined either to organize themselves into a union or join the other unions. There is no intimation in the record that appellee induced them thus to decline or that he ever suggested to any of them that they decline the request. The protest against appellee's employing non-union labor, therefore, had no reference to any refusal on his part to comply with any demand or request that had been made by appellants or any of their representatives. As far as the testimony shows, none of the members of the unions here involved were skilled in the work of house-moving and there was no house-mover's union available to appellee or his employees. If he had discharged his non-union men, therefore, it necessarily would have meant that his business of house-moving contractor would have ended or would have to be conducted with men inexperienced in that occupation, which, he said, could not be done.

The second protest seems to have been directed at appellee's employees. It protested their failure to join unions affiliated with the Amarillo Building and Construction Trades Council. The court found that the picketing had injured appellee and its continuation would result in further injury to him. It is clear, we think, that no industrial dispute or labor controversy between appellants and the appellee could result from the failure of employees to comply with a demand or request that they join labor unions.

██ As we understand the law, as it is interpreted by the Ritter and Dickson cases above cited and others, a State is not without power to confine the free speech and communication, which is the essence of the constitutional right to publicize labor controversies by picketing and the display of banners, to the sphere that is directly related to a dispute or controversy.

Article 5154f accomplishes that purpose when it makes it unlawful for any person to participate in a secondary picketing or secondary boycott where there is no labor dispute existing between those who establish the picket or institute the boycott and the person or institution against whom the picketing is directed.

The questions involved in this case are not the same as those involved in the recent case of International Unions of Operating Engineers, Local No. 564, et al. v. Cox, dba Velasco Laundry and Cleaners, Tex., 219 S.W.2d 787, and therefore the holding in that case that a portion of Article 5154f is unconstitutional does not affect the portion of the statute that is applicable here.

From what we have said it follows that, in our opinion, appellants' contention that the injunction deprives them of their constitutional rights of free speech and free assembly; that Article 5154f, V.R.C.S., is unconstitutional in so far as it purports to authorize the issuance of the injunction; and the purpose for which appellants picketed the appellee were valid and lawful are not supported by the law as it is interpreted by the courts, both Federal and State. The judgment of the court below will therefore be affirmed.

On Motion for Rehearing.

PER CURIAM.

██ In their motion for rehearing appellants assert that we erred in holding that no contract was in existence or had ever been made between appellee and the appellant labor unions or any of their members. They contend there was a contract existing between them and appellee to the effect that appellee would hire skilled union craftsmen to erect the arena on the fairgrounds at Amarillo. The testimony showed that, when appellee began the work of dismantling the hangers at Dalhart, the officials of the Iron Workers' Union requested him to employ members of the union to take down the iron trusses. The discussion resulted in an agreement that it would not be practicable to use the union men at Dalhart because their work would necessarily be intermittent. Appellants say that, in the conversations which ensued, a contract was made

between the union officers and appellee to the effect that the union officials would not further insist upon the employment of union members in the work of dismantling the hangers at Dalhart and that appellee would employ union men to erect the arena after the hangers had been removed. Appellee testified that the union officers agreed among themselves that they would not further insist upon his employing union labor at Dalhart but that he would employ them to perform the work at Amarillo. He said they made such an agreement out of his presence and then came to him and told him of it. He then told them he would "hire union men, any that I hired over and above our house-moving crew; * * * that whatever amount of men we had to hire, and I told them that I would hire union steel erectors." He testified further that all of the extra men employed by him in erecting the arena were union men but that practically all of the work in connection with its erection was performed by his house-moving crew. The union men employed by him were carpenters and welders employed on behalf of the county to perform work that was not included in his contract. We fail to find the elements of a binding, legal contract in this incident. The only portion of the conversation that could be deemed a consideration for the contract was that appellants' officers would not further insist upon appellee's employing union iron workers at Dalhart if appellee would employ them to erect the arena at Amarillo. Appellee was under no legal obligation to employ union members at Dalhart and the mere agreement on the part of the union officers to cease demanding that he do so could not constitute a valid, legal consideration for a contract. Moreover, it is evident from the testimony that the minds of the parties did not meet upon either the proposition insisted upon by appellants or the purport of the conversations as contended for by appellee and, in support of the judgment, we must conclude the trial court found that no contract existed between them.

It is plain that appellants' demands in this respect had no reference to the violation of any contract of employment because no such contract had been made under which appellants or any of their members had been employed by appellee. It did not relate to wages being paid to appellants nor to any laborers connected with them nor to their health, safety or the right of collective bargaining. No dispute existed as to working conditions of appellants or any of their members nor could there have been, because none of them was employed by him. All this sums up to the conclusion that no legitimate controversy in reference to labor matters was involved. The only demand revealed by either the testimony or the placard that was carried by the picketer was that appellee employ union members to perform a portion of the work incident to erecting the arena or that the members of his own crew either form a union among themselves or join the appellant unions. It has been held a number of times that neither of these classes of demand constitutes a lawful labor objective. Miller v. Tobin et al., 189 Misc. 296, 70 N.Y.S.2d 36, Lafayette Dramatic Productions, Inc., v. Ferentz et al., 305 Mich. 193, 9 N.W.2d 57, 145 A.L.R. 1158, and cases there cited.

We have carefully considered the motion for rehearing but find nothing presented by it that changes our views as expressed in the original opinion. The motion will therefore be overruled.