AUSTIN v. PAINTERS' DISTRICT COUNCIL NO. 22, BROTHER-
HOOD OF PAINTERS, DECORATORS AND
PAPERHANGERS OF AMERICA.

1. LABOR RELATIONS—RIGHT TO STRIKE—PEACEFUL PICKETING—LA-
BOR OBJECTIVE.

A union has a right to strike and to do peaceful picketing when
the objective is the accomplishment of a legitimate labor ob-
jective.

2. SAME—RESISTANCE TO UNLAWFUL LABOR OBJECTIVES.

An employer has the right to resist an unlawful labor ob-
jective and to resort to the courts in the enforcement of
rights.

3. SAME—DEVICES USABLE BY EMPLOYERS—HEALTH AND WELFARE
OF EMPLOYEES.

An employer has the right to conduct a legitimate business for
profit and to use modern devices in the conduct of such busi-
ness so long as the devices used are not inimical to the
health and welfare of the employees.

4. SAME—STRIKES—UNEMPLOYMENT.

The public has an economic interest in unemployment growing
out of strikes.

5. SAME—STRIKE—PICKETING—LABOR OBJECTIVE.

Acts of a union in calling a strike or peacefully picketing an
employer constitute a lawful labor objective if they have any
reasonable connection with wages, hours of employment,
health, safety, the right of collective bargaining or any other
condition of employment or for the protection from labor
abuses.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 3, 5, 6, 8, 11] 31 Am Jur, Labor §§ 204, 208, 230.
[7] 3 Am Jur, Appeal and Error § 814
[9, 10] 30 Am Jur, Judgment §§ 212, 219.
[12] 30 Am Jur, Judgment § 201.
[13] 31 Am Jur, Labor § 298.5.

6. SAME—PAINTERS—PAINT ROLLERS—LABOR OBJECTIVE—HEALTH—EVIDENCE.

Whether or not a painters' union's proposal to restrict the use of pan rollers and pressure-fed rollers in applying paint is a lawful labor objective, because harmful to the health and well-being of labor, depends upon the facts in each case.

7. APPEAL AND ERROR—CHANCERY CASES—CREDIBILITY OF WITNESSES—DEMONSTRATIONS.

The Supreme Court is privileged to make an independent finding of fact upon reviewing a chancery case, but in doing so it takes into consideration the conclusions reached by the trial court as he has a greater opportunity of appraising the credibility to be given to the testimony of witnesses and viewing demonstrations.

8. LABOR RELATIONS—PAINT ROLLERS—HEALTH—LABOR OBJECTIVES.

Finding of trial court that the use of pan rollers and pressure rollers in applying paint is not injurious to the health or detrimental to the safety of the user *held,* supported by the evidence, hence, insistence by painters' union that the use of such rollers be restricted was an unlawful labor objective for which striking was not lawful.

9. JUDGMENT—RES JUDICATA—PARTIES—DECISION ON MERITS.

A former case was not *res judicata* of issues involved in instant case, where there were different parties and bill to enjoin defendant union was dismissed but it is apparent the decree entered was on the pleadings and not on the merits.

10. SAME—RES JUDICATA—DECISION ON MERITS—ISSUES—PARTIES.

A judgment must be rendered upon the merits, upon the same matter in issue and between the same parties or their privies in order to constitute a bar to a claim in a subsequent action.

11. LABOR RELATIONS—COLLECTIVE BARGAINING—LABOR OBJECTIVES.

There is no obligation on the part of either the employer or the employee to bargain collectively in the furtherance of an unlawful labor objective.

12. JUDGMENT—JURISDICTION—FACTUAL SHOWING.

Jurisdictional questions may be raised at any time, but there must be some showing of facts upon which such a claim can be founded.

13. INJUNCTION — DECREE — REOPENING CAUSE — JURISDICTION — DISCRETION OF COURT.

   Trial court's denial of petition to reopen suit by painting contractors to enjoin painters' union from striking in order to restrict the use of pan and pressure-fed paint rollers so that defendants might show that plaintiffs were engaged in interstate commerce, in which event the national labor relations board would have exclusive jurisdiction *held*, not an abuse of discretion under record presented, where petition was not filed until nearly 8 weeks after entry of decree (29 USCA, § 141 *et seq.*).

Appeal from Wayne; Maher (Thomas F.), J. Submitted April 14, 1954. (Docket No. 65, Calendar No. 46,128.) Decided June 7, 1954. Rehearing denied September 8, 1954.

Bill by James Austin and 18 other painting contractors and associations against Painters' District Council No. 22, Brotherhood of Painters, Decorators and Paperhangers of America, A.F.L., a voluntary unincorporated association, and various officers, to restrain enforcement of illegal restrictions in respect to use of paint rollers. Wayne Association of Painting and Decorating Contractors, Inc., and Brotherhood of Painters, Decorators & Paperhangers of America, A.F.L., an unincorporated voluntary association, intervened as parties defendant. Decree for plaintiffs. Defendants appeal. Affirmed and remanded for appropriate injunctive relief.

*Robert A. Sullivan* and *Rex Eames* (*McGraw, Sullivan & Ferguson,* of counsel), for plaintiffs.

*Edward N. Barnard,* for defendants and intervening defendants.

*J. Albert Woll, Herbert S. Thatcher* and *James A. Glenn,* of counsel, for intervening defendant Brotherhood of Painters, Decorators and Paperhangers of America, A.F.L.

SHARPE, J.  This chancery suit grows out of a dispute between plaintiffs and defendants over a contract entered into between the parties governing their labor relations.  Plaintiffs, James Austin, *et al.,* are representatives of themselves and certain painting and decorating contractors in Detroit and Pontiac and surrounding areas.  The defendants are Painters' District Council No. 22, Brotherhood of Painters, Decorators and Paperhangers of America, *et al.* Wayne Association of Painting and Decorating Contractors, Inc., *et al.,* are intervening defendants.

The plaintiffs have had contractual relations with defendant union, and the last preceding collective bargaining agreement prior to the institution of the present suit was for the period of May 1, 1952, to April 30, 1953.  The collective bargaining agreements all contained restrictions upon the use of spraying equipment as related to the type of surface to be painted, but the agreements contained no restrictions upon the use of pan or pressure roller equipment.

The conditions regulating spraying and spray equipment are as follows:

"Sec. 1. To avoid any future legal entanglements and so that the union shall at all times have the indisputable right to use whatever means or methods necessary to protect the health of its membership, the employer agrees that the following:  *  *  *

"A. Spraying of white lead or red lead paints shall not be allowed at any time or place.

"B. Spraying of materials containing lacquer thinners or any other toxic thinners shall not be allowed at any time unless all necessary precautions and safeguards are used, such as proper masks or hoods, and only when suction fans are used to withdraw dangerous fumes.

"C. The union reserves the right to have all materials recommended to be applied by spray machine

to be thoroughly tested by a qualified testing laboratory. * * *

"Sec 3. Surfaces not sprayable under any conditions: putty coat plaster, sand finished plaster or similar smooth surfaces, doors, sash, paneled partitions or trim of either wood, metal or composition materials. This shall not include ribbed deck ceilings.

"Sec. 4. In new construction on industrial manufacturing plants, commercial warehouses and commercial garages all surfaces above the dado line, with the exception of the surfaces prohibited in section 3 hereof, and with the exception of heating, ventilating, plumbing, electrical and all other mechanical installations, may be sprayed. Finish coats on dado shall be brushed, except cinder block surface dados which may be sprayed.

"Sec. 5. In old and/or occupied industrial plants, commercial warehouses, and commercial garages, all surfaces above and below the dado line, with the exception of the above prohibited surfaces as enumerated in section 3 hereof, and also with the exception of newly-installed heating, ventilating, plumbing, electrical and all other mechanical installations, may be sprayed.

"Sec. 6. On all residential types of structures, both old and new, spray work shall not be permitted, except on the following items: radiators, fine grill work, open joist ceilings, cement block basements.

"Sec 7. On all theatre structures, office buildings, and mercantile establishments and on all churches, schools, and hospitals, spray work shall not be allowed except on new cinder block walls, radiators, fine grill work, open joist wood ceilings, rough poured concrete open joist ceilings, porous acoustical surfaces, brick walls and rough surfaces of boiler rooms and fan rooms."

In February, 1953, the defendant union sent notices of reopening to the various painting and decorating contractors and negotiations were thereafter

conducted. The defendant union proposed a contract relating to restrictions upon the use of pan and pressure roller equipment similar to the restrictions relative to spraying equipment. The plaintiffs declined to enter into such a contract on the ground that such provisions were unlawfully in restraint of trade and were in furtherance of an unlawful labor objective. On May 1, 1953, the union called a strike of the employees of all painting and decorating contractors who had refused to sign the proposed contract.

On May 12, 1953, plaintiffs filed their bill of complaint in the Wayne county circuit court for temporary and permanent injunctive relief against the defendants on the theory that the strike was in furtherance of an unlawful labor objective and in restraint of trade. A show cause order was issued, and thereafter informal conferences were held with a circuit judge. On June 11 and June 12, 1953, plaintiffs entered into collective bargaining agreements with defendant union containing the above-mentioned restrictions. The employees returned to work on June 15, 1953, but the men went on strike again on June 15 and June 16, 1953. On June 19, 1953, an agreement was entered into which reads, in part, as follows:

"*The Court:* It is hereby agreed by and between the respective parties to this action that the intent of both parties is that the resumption of work will be immediately. Second that the plaintiffs will file an amended bill of complaint which will have to do with the pan and pressure rollers solely. All other points raised in the bill and the supplemental bills filed, and the letters, from the respective parties will be withdrawn and abandoned by both parties.

"It is further agreed that both sides will proceed with this trial promptly and will appeal this court's decision and process the same diligently, and that the

contract will provide the same spray regulations as contained in the 1952 contract, with the exception that the health measures contained in article 10, section A, B and C will be inserted, and the section that has to do with the size of the brush and what materials will be used will be the same as contained in the 1952 contract."

The amended bill of complaint filed July 10, 1953, contains the following:

"That in connection with the painting and decorating services performed for the people of the State of Michigan, including State and local governmental agencies, various methods of application of paint, including pan rollers and pressure-fed rollers, could be used in addition to the more usual brush method of application.

"That the recently developed pan-roller method of applying paint is substantially more efficient and rapid in applying paint to smooth surfaces than the brush method; that the pan-roller method in no way endangers the health or safety of the user; that millions of housewives throughout the country have employed the pan-roller method in painting the interiors of their homes; that the substantial reduction in cost which would be effected by the use of the pan-roller method can be passed on to the public, including various agencies of the city of Detroit and State of Michigan.

"That the pressure-fed roller has recently been developed and perfected in the application of paint; that the pressure roller uses a pressure system to bring the paint from a tank through a hose to the applicator; that such rollers are commonly known as pressure rollers and because they eliminate the manual method of applying paint are a substantial improvement over the existing hand rollers or brush method of application; that said pressure rollers apply paint on flat surfaces in a much shorter time than it takes to paint such surfaces with a brush or a pan-roller; that various contractors have used such

pressure rollers and have found that by using such pressure rollers, the painting can be done much more economically and a substantial saving in cost can be effected; that such savings can be passed on to the members of the public, including various agencies of the city of Detroit and State of Michigan.

"That for a considerable number of years defendant union has unlawfully conspired to restrict and prohibit the use of the pan roller and the pressure roller in the painting and decorating industry; that none of the collective bargaining agreements up until April 30, 1953, contained any express provisions restricting the use of pan rollers or pressure rollers; that during these years, the defendant union simply instructed its members not to use such equipment.

"That the last collective bargaining agreement between plaintiffs and defendant union expired in accordance with its terms on April 30, 1953; that preceding the expiration of said agreement, collective bargaining was conducted between said parties during which bargaining plaintiffs were handed a sample copy of defendant's proposed agreement; that said proposed agreement contained express provisions that would materially and substantially restrict and limit plaintiffs' usage of pressure-fed rollers and pan rollers; that plaintiffs were informed by defendant that they must sign said agreement with said restrictions therein, or suffer the consequences; that plaintiffs refused to sign such agreements with said restrictive provisions therein, as plaintiffs believed, and so informed defendant, that such restrictive provisions were unlawful under the restraint of trade laws of the State of Michigan, and, also, an unlawful interference with plaintiffs' constitutional rights to conduct their businesses as they deemed proper; that commencing on May 1, 1953, defendant union called a strike of all employees of those painting and decorating contractors who refused to sign said agreement with said restrictive provisions therein; that the purpose of said strike was to compel

and coerce plaintiffs to agree to the aforementioned restrictive provisions.  * * *

"That said provisions restricting the use of pressure rollers and pan rollers have no reasonable connection or relationship to legitimate and lawful purposes of trade unions in that the use of such equipment is in no way hazardous or detrimental to the health or safety of plaintiffs' employees; that the nature of the proposed restrictions clearly demonstrates and establishes that the use of such equipment is in no way detrimental to the health and safety of plaintiffs' employees; that said proposed restrictions in the main prohibit the use of roller equipment in the application of paint to smooth surfaces but do not prohibit the use of said equipment in the application of paint to rough or uneven surfaces; that the pressure-fed roller and pan roller equipment can only be used effectively and efficiently in the application of paint to smooth surfaces; that it is clear and apparent that said restrictions have no relationship to the health or safety of plaintiffs' employees when it is understood that said restrictions are related to and dependent upon the type of surface to be painted; that the purpose of defendant union in seeking said restrictions is to stultify and obstruct technological improvement within the painting and decorating business in utter disregard for the welfare and interest of the people of the State of Michigan.

"That defendant union's purpose and efforts to compel plaintiffs to restrict and limit their use of said pressure rollers and pan rollers are unlawful invasions of plaintiffs' constitutional and legal rights to engage in their business of painting and decorating; that in the exercise of said constitutional and legal rights, plaintiffs have the right to utilize newly-developed techniques and methods of applying paint where such techniques and methods in no way endanger the health and safety of plaintiffs' employees.  * * *

"That said provisions restricting the use of pressure rollers and pan rollers are in violation of valid

statutes of the State of Michigan, in that said provisions would constitute a combination of persons for the purpose of restricting trade and commerce; that the performance of said agreements by plaintiffs does effect a substantial and injurious restriction upon plaintiffs' trade and commerce in their painting and decorating businesses; that such a combination would be in violation of section 16647 of the Compiled Laws of Michigan of 1929.*

"That said restrictive provisions are illegal and void under valid statutes of the State of Michigan, in that said restrictive provisions constitute agreements or contracts by which plaintiffs are required to restrict and limit the extent to which they engage in the business of rendering painting and decorating services; that such restrictions and limitations would be unlawful and unreasonable under section 16667 of the Compiled Laws of Michigan of 1929.† * * *

"That defendant union's purpose and objective in restricting and limiting the use by plaintiffs of pressure rollers and pan rollers is not a lawful labor objective under Michigan law in that it has no reasonable connection with any dispute or controversy relating to wages, working conditions, hours of work, health, safety, the right of collective bargaining, or the protection of labor from unlawful abuses; that defendant union on May 1, 1953, called a strike of all the employees of plaintiffs for the purpose of inducing and compelling plaintiffs to execute collective bargaining agreements containing the aforementioned restrictive provisions relating to the use of pressure rollers and pan rollers; that said purpose and objective of defendant union constituted an unlawful labor objective in that the effectuation and accomplishment thereof illegally interferes with plaintiffs' legal rights to conduct their painting and decorating businesses as they deem proper.

* CL 1948, § 445.701 (Stat Ann § 28.31).—REPORTER.
† CL 1948, § 445.761 (Stat Ann § 28.61).—REPORTER.

"That the aforementioned strike called and conducted by defendant union against plaintiffs commenced on May 1, 1953, and continued to on or about June 19, 1953; that the purpose of this strike was to compel plaintiffs to agree to the aforementioned restrictive provisions relating to the use of pressure rollers and pan rollers; that the economic pressures exerted against plaintiffs by means of this strike were tremendous and, finally, became so great that plaintiffs on or about June 19, 1953, were compelled to execute collective bargaining agreements containing the aforementioned restrictions upon the use of pressure rollers and pan rollers; that the agreement executed between plaintiffs and defendant union, terminating said strike on said date, specifically provided that plaintiffs were entering into said agreement under express protest to the inclusion of the aforementioned restrictive provisions relating to the use of the pressure roller and pan roller, and that plaintiffs were executing such agreement with a full reservation of their legal and equitable rights in respect to obtaining a judicial determination of the legality of said restrictions."

Defendant union filed an answer to plaintiffs' bill of complaint in which they—

"allege that the use of pan rollers and pressure-fed rollers in application of paint would spoil and depreciate the present standard of painting and decorating, and the use of such rollers causes paint not to adhere properly to the surface to which it is applied, and causes paint to peel and become unsightly, and harm and injure the reputation of all persons engaged in the painting and decorating industry.   *   *   *
"They allege that the pan-roller method of applying paint is cumbersome, difficult to use, and such rollers are heavy and awkward and burdensome to the painter; they tend to create lameness and soreness in the arms and hands of the painters, and are injurious to health, and the said pan rollers are in-

efficient and ineffective in applying paint and do not result in penetrating the wood or other surfaces with the paint as does the brush method of application, as such painting methods result in a much more precarious and temporary coat painting. The paint is apt to peel off and rapidly deteriorate, and this method of application tends to depreciate and degrade the reputation of the painter, and also tends to make of the painting industry an unskilled trade and an unreliable trade, and great hurt and damage to persons engaged in the painting trade. They deny that housewives, unskilled and untrained, have used the pan-roller method or can use the pan roller in properly applying paint. They further allege that in the great majority of cases, housewives who attempt to do their own painting by use of rollers, find they have made a hopeless 'mess' in their efforts and are compelled after a hopeless waste of time, effort, and money, to employ professional painters to repair the damage which their amateur efforts have caused, with the aid and cooperation of the rollers advocated by the plaintiffs. *   *   *

"They further represent that the method of painting by the use of pressure rollers or manual rollers is very difficult and burdensome and injurious to the health of workmen; that the use of such rollers requires the workmen to expend periods of time in the use of a heavy roller and heavy attachments and overhead work with one arm, and such methods of painting are ruinous to the health and physical competency of workmen. They further allege that in order to use pressure rollers, all the paint which is applied by such means has to be too thin to be practical or efficient or proper painting material; that said rollers are from 8 to 10 inches long and each of them is attached to a hose dangling from the end, and said hose is used to supply paint for the roller to keep the roller constantly filled. In view of the fact that the roller is always filled with paint, and has a heavy hose attached to it, it is heavy and difficult to use, and its use requires the painter to push it over-

head continually all day long with one arm, and the daily process of so doing would practically wear out a man's arm, and it would become lame and its use a painful operation. They further allege that the use of such rollers would reduce the painting trade to a nonskilled trade, and would to a great extent render apprenticeship painting obsolete, and would encourage poor standards of work and workmanship, and would completely discredit the painting trade and the painting trade industry.  *  *  *

"They also deny the allegation that newly-developed techniques and methods referred to by the plaintiffs no longer endanger the health and safety of the plaintiffs' employees, and they allege that the appliances sought to be used by the plaintiffs are injurious, and the employees of the plaintiffs, as represented by defendants, assert their right to refrain from working for the plaintiffs so long as the plaintiffs do not agree, and keep their agreement, to eliminate unsafe and unhealthful and injurious tools and appliances pertaining to the painting and decorating business.  *  *  *

"They allege that these defendants have not attempted and are not attempting in any way to restrict the trade, but on the other hand they are endeavoring by contract and by persuasion to safeguard and protect the legitimate rights and interests of American workmen who desire to work for fair wages and under fair working conditions, in a country where wages and working conditions are judicially fair, and living standards are respectable for workmen as well as for contractors.  *  *  *

"They allege that the objections of members of the defendant union to the use of pan rollers and pressure rollers did relate to wages and working conditions, and hours of work, health, safety, and the right of collective bargaining, and the protection of labor from unlawful abuses. In support of such allegations they refer to their answer to paragraphs 6 and 7 of this answer to the plaintiffs' substituted bill of complaint, the same as though again repeated.

These defendants again emphatically deny that the purposes and objectives of the defendant union constitute an unlawful objective, and they also deny the effectuation and accomplishment thereof would illegally interfere with the plaintiffs' legal rights."

The cause came on for trial, at which time testimony was offered and received respecting the issues involved.  On August 5, 1953, the trial court filed an opinion which contains the following:

"The court heard the testimony offered by the plaintiffs and the defendants for and in behalf of their respective positions and is of the opinion that these demands do not have any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment, or for the protection of the workmen from labor abuses.  One thing that the court observed in the testimony as offered by the defendants, and all of the defendants who testified were experienced painters, was that they testified that the use of pan rollers and pressure-fed rollers is hazardous, unsafe, and unhealthful, but when they were asked the question as to whether they had ever used a pan roller, they said that the only time that they had used it was in the painting of their own homes.  If the pan roller can be operated with safety in their own homes, then certainly it could be operated on any job in a safe and healthful manner.  *  *  *·

"The court also following the taking of testimony had a visual demonstration offered by the plaintiffs at the Durfee Intermediate School and by the defendants at a new home located on Carroll avenue in the city of Detroit, and found that the pressure roller and/or pan roller could be used effectively without any risk insofar as health or safety are concerned.  If the court had any doubt in its mind prior to these visual demonstrations, it was eliminated completely by such demonstration.

"Therefore a decree may be entered in this case in accordance with this opinion and the plaintiffs may have such relief as therein prayed for."

A decree was entered September 22, 1953. The decree contains the following:

"It is therefore ordered, adjudged and decreed:

"1. That defendant union may not insist upon the inclusion in the 1953 union contract between the plaintiff employers who are parties to this suit, and themselves, that portion of section 2 of article 10 of the said proposed 1953 contract commencing with the word 'conditions' and continuing to the end of the section, and the conditions regulating the pressure and/or pan-roller applicators as contained in the proposed 1953 contract have no reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment or for the protection of workmen from labor abuses, and further that the insistence that those conditions be embodied in the 1953 contract is an unlawful labor objective and therefore illegal and void and the same shall be deleted from section 2 in the 1953 contract and the retained portion of said section 2 shall read as follows:

" 'Wages to be paid for the use of pressure-fed rollers and pan-roller applicators shall be the same as for spraying and spray equipment.'

"2. The 1953 contract shall contain the same spray regulation as contained in the 1952 contract with the exception that the health measures consisting of sections A, B and C, of article 10 of the proposed 1953 contract shall be included in the said article 10 of the said 1953 contract.

"3. The 1953 contract shall include the same provision with respect to the limitation of the size of brushes and materials to be used in them as is found in subsection 6 of article 14 of the 1952 contract.

"4. No injunction, temporary or permanent, shall issue unless the Supreme Court so decides, or unless it shall appear that no appeal from this decree is

taken, or that any appeal that may be taken is not prosecuted with reasonable diligence; and if and when such may appear plaintiffs may apply to this court for an injunction as prayed for in the supplemental bill of complaint.

"5. All other portions of the 1953 contract as signed by the parties shall be in full force and effect, except as above modified, until the expiration date thereof.

"6. The only matters adjudicated in this cause were the use of pressure and pan rollers, all in accordance with the stipulation dictated by the court herein."

Defendants appeal from the decree entered. In this case and all others of a similar nature, there are 3 parties involved, namely, the union, the management, and the public, and each have certain rights and responsibilities. All courts agree that the union has a right to strike and to do peaceful picketing when their objective is the accomplishment of a legitimate labor objective. The management has the right to resist an unlawful labor objective and to resort to the courts in the enforcement of their rights. Management also has the right to conduct a legitimate business for profit and to use modern devices in the conducting of such business so long as the devices used are not inimical to the health and welfare of its employees. The public has an economic interest in unemployment growing out of strikes.

What is an unlawful labor objective? In *Lafayette Dramatic Productions, Inc.,* v. *Ferentz,* 305 Mich 193 (145 ALR 1158), we quoted with approval from *Opera on Tour, Inc.,* v. *Weber,* 285 NY 348, 355 (34 NE2d 349, 136 ALR 267); certiorari denied, 314 US 716 (62 S Ct 477, 86 L ed 570). In that case the court held that it was an unlawful labor objective for a musicians union and a stage hands union to combine to compel the employer to discard the use of record-

ing machines in favor of the employment of musicians (p 210):

" 'Does this demand of these defendant unions, that plaintiff discard machinery in the interest of the immediate employment of a few individuals, constitute a lawful labor objective? If the acts of these unions have any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment or for the protection from labor abuses, then the acts are justified. (*National Protection Association of Steam Fitters & Helpers* v. *Cumming,* 170 NY 315 [63 NE 369, 58 LRA 135, 88 Am St Rep 648]; *Bossert* v. *Dhuy,* 221 NY 342 [117 NE 582, Ann Cas 1918D, 661]; *J. H. & S. Theatres, Inc.,* v. *Fay,* 260 NY 315 [183 NE 509]; *Goldfinger* v. *Feintuch,* 276 NY 281 [11 NE2d 910, 116 ALR 477]; *May's Furs & Ready-to-Wear, Inc.,* v. *Bauer,* 282 NY 331 [26 NE 2d 279]; *Baillis* v. *Fuchs,* 283 NY 133 [27 NE2d 812].) If on the other hand the labor objective here sought is illegal and not a lawful labor objective, since it has no reasonable connection with wages, hours, health, safety, the right of collective bargaining, or any other condition of employment or for the protection of labor from abuses, then there is no immunity for injury inflicted by a labor union.' "

The test for determining the legality or illegality of the union's acts and purposes is, whether such acts and purposes have any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment, or for the protection from labor abuses. Whether the proposal of the union to restrict the use of pan rollers and pressure-fed rollers is a lawful labor objective, because harmful to the health and well being of labor, depends upon the facts in each case. The trial court found as a fact that the use of pan rollers and pressure rollers is not

injurious to the health or detrimental to the safety of the user.

The court had the benefit of hearing the testimony of E. E. Thomas, witness for plaintiffs and a manufacturer of paint rollers. In describing the operation of paint rollers, he testified:

"I am familiar with the spray gun, and its method of applying paint. I am familiar with the mechanics of applying paint with a pressure roller. There is a difference in connection with the method of applying paint through a spray gun as compared with a pressure roller. The spray gun actually has air carrying the paint to the wall, and the orifice of the spray gun would be several inches from the wall. There might be as much as a foot or 2 feet in some cases. So you definitely have a spray with a spray gun. With the pressure roller, you cannot have a spray, because the air is in the top of the tank. The paint is heavier than air so the paint is in the bottom of the tank, and the paint goes through the hose, up through the tube to the roller and oozes out through the small orifices in the roller cover, and as the paint is used, the thumb is pressed on the button, more paint comes out, and as you need more paint, you simply press the button and allow more paint to come up. But it is the air pressure in the tank pressing the paint through the tube. There is no air at all released through the roller itself. The air is kept in the top of the tank. The air does not break up the paint, definitely not."

George Foster, a painting and decorating contractor and a witness for plaintiffs, testified:

"*A.* The pressure roller, the air, there is very little air in that tank, and it just oozes the paint through this roller. It just oozes out. It does not come out like a spray gun. You haven't got a fog like you have with a spray gun. It just oozes the paint through the roller and when you put your finger on here and roll

it along, it is just oozing the paint through this roller. * * *

. "I have used a spray gun on numerous occasions. In connection with the spray gun, the paint reaches the surface, reaches the smooth surface by air pressure back of it. There is no contact by the spray gun itself on the wall or the surface being painted. You stand back from the wall. In connection with the pressure roller you take it like this and you lay it on the wall, and press this little button and just roll it along, right on the wall itself. That air pressure does not apply the paint to the surface. It pushes the paint through the hose up to that roller.

"*Q.* As it relates to the pressure roller, Mr. Foster, is there any fog, spray fog, that appears in connection with the use of this roller?

"*A.* There is no fog."

The trial court also had a visual demonstration as related in his opinion.

Russell Childs, a painter and decorator and a witness for defendants, testified:

"*Q.* I will ask you whether or not, in your opinion, the use of a roller, a pressure roller, or a pan roller, either of them is safe as to health?

"*A.* They are not. * * *

"*Q.* All right, why do you say it is injurious to health?

' "*Mr. Sullivan:* I don't think because a man is particularly sloppy with a pan roller, when even women can use a pan roller, and one man comes in and says it drips all over him, that that is relevant, and that is the type of testimony we have been getting. * * *

"*A.* It gets into your nostrils and into your throat and coats your teeth and I have felt when I went home in the evening you were full, you were full of. gases and you couldn't eat. That is what lead poisoning or any thinner does to you. Any painter will tell you that, who has painted in any fumes or has got any paint into his lungs or anything like that,

he loses his appetite completely and is not able to eat. I have had those experiences many times."

In the use of pressure rollers, Russell Childs testified:

"*A.* I might say this that you are in danger at all times. On several different occasions, why you have been staggered or pulled sideways from the weight of the tank and stepping around over beams and such as that. You have to be very careful. I have had that happen. During the period of time that I have used this hose and this roller, that I have gotten the paint on my body that I have described, I have made efforts to try to get it off. Used pretty near everything in the book to get it off from turpentine to thinners, to the patented hand cleaners and such as that.

"*Q.* What is the difference between the amount of paint that you get on your body and in your hair and over your body when you are doing this work with a roller, whether it is on the wall or wherever it is and that when you are doing it with a brush?

"*A.* There is a lot of difference. I have painted all day with very, very few spots, maybe 2 or 3, on my face, and very few spots on my hands with a brush, and with a 4 and 4-1/2-inch brush on ceilings with 2 or 3 other men. The fact of the matter is that a painter working on a scaffold with other men that are painting, if he gets a spatter of paint in his face from another man along side of him, he gets a cussing out.

"*Q.* You don't permit them to spatter paint on you. Is there any way that you know of of using a roller without spattering the paint over the scaffold?

"*A.* There is not. Whether it is on the wall or the ceiling, there is still a spatter. There is still a spray that comes off, in solid particles like a mist. I have had effect during the time that I have rolled, used these rollers, so far as the effect upon my breathing is concerned. As I stated before when you are through in the evening and your lungs are filled up with paint, and paint fumes, and the solid particles, in my opinion it is more dangerous than what a spray

gun is. A spray gun, when you are spraying, breaks the particles up so very, very fine that you possibly just get the vehicle from the paint, but this here gives you the solids and all, and you get the pigment, which in most cases are more poisonous than what the liquid is in paint, and you get it into your mouth and your nostrils and it works into the pores of your skin."

Other testimony was given on behalf of the defendants of a like nature. It is evident that there is a clear cut dispute relative to the harmful effects of pan and pressure rollers.

Defendants urge that the findings of facts of the trial court are contrary to the great weight of the evidence. This is a chancery case, and, as such, we are privileged to make an independent finding of fact. In reviewing the evidence we take into consideration the conclusions reached by the trial court, as his opportunity of appraising the credibility given to the testimony of witnesses is far greater than ours. In addition to seeing the witnesses and hearing the evidence, the trial court also witnessed a demonstration of the use of both rollers. We note that one demonstration was conducted by plaintiffs and the other demonstration was conducted by defendants.

We have examined the evidence produced by both parties and are constrained to hold that the findings of fact and the conclusions reached by the trial court are not against the great weight of the evidence. It follows that the attempt on the part of defendants to restrict the use of pan and pressure rollers by striking is an unlawful labor objective.

Defendants also urge that the court erred in failing to hold that decision in a prior chancery case in Wayne county was *res judicata* of the issues in the present case. We have examined the record in the former case and find that some of the parties in the present case were not parties in the former case.

We also find that the decree entered in the former case reads as follows:

"At a session of said court held at the courthouse for Wayne county, in the County Building, in the city of Detroit, Michigan, on the day of July 6, 1950.

"Present: The Honorable Thomas J. Murphy, Circuit Judge.

"This cause having come on to be heard, the parties being represented in court by their respective counsel, and a motion for a decree on the pleadings dismissing the bill of complaint having been made on behalf of the defendants, and

"It appearing that despite a provision in the contract between the defendant union and the plaintiff employers providing for arbitration, there has been no arbitration on the question of the use of pressure rollers for applying paint.

"And it appearing that the bill of complaint should be dismissed;

"On motion of Edward N. Barnard, attorney for defendants;

"It is ordered, adjudged and decreed that plaintiffs' bill of complaint is on the merits dismissed with prejudice, with costs to defendants to be taxed."

It is apparent that the decree entered in the above case was on the pleadings and not on the merits. The record does not show that any testimony was offered in the prior case. In *Tucker* v. *Rohrback,* 13 Mich 73, we said:

"That a judgment, to constitute a bar to a claim in a subsequent action, must be rendered upon the merits, upon the same matter in issue, and between the same parties or their privies, is unquestionable."

See, also, *Creek* v. *Laski,* 248 Mich 425 (65 ALR 1113); *Leib* v. *Bostwick,* 256 Mich 277; *McDannel* v. *Black,* 270 Mich 305.

Under the circumstances of this case the doctrine of *res judicata* has no application.

It also appears that some weeks after the decree was entered and filed defendants filed a petition to reopen the cause for certain purposes, namely, to show that:

"Defendants are in a position to show that plaintiffs are engaged in interstate commerce, and that they have refused to collectively bargain with defendants."

Plaintiffs filed an answer to the above petition in which they allege:

"That neither of the said 2 issues are properly before this court for the reason that defendants failed to introduce any evidence to support the raising of said issues; and plaintiffs, without admitting that said 2 issues are here involved, deny that the businesses of plaintiffs are in interstate commerce as defined by the labor management relations act of 1947,* and further deny that said plaintiffs have refused to collectively bargain with plaintiffs [defendants sic?]."

On November 16, 1953, the court entered an order denying defendants' petition to reopen the cause for certain purposes. The issues now being raised were not advanced during the trial of the cause nor are they assigned as issues in defendants' reasons and grounds of appeal, but they are advanced in a supplemental brief filed by defendants.

Defendants claim that plaintiffs refused to collectively bargain with defendants. While there is some dispute involved in the facts of this claim, we deem them unimportant as in our opinion there is no obligation on the part of either party to bargain collectively in the furtherance of an unlawful labor objective. Moreover, the trial court found as a fact that there was no showing of any interference with defendants' claimed right to collective bargaining.

* See 29 USCA, § 141 *et seq.*—Reporter.

It is now urged by defendants that if plaintiffs were or are engaged in interstate commerce, the national labor relations board has exclusive jurisdiction and that jurisdictional questions may be raised at any stage of pending proceedings. While it is true that jurisdictional questions may be raised at any time, yet, there must be some showing of facts upon which such a claim can be founded. We have examined the record and find nothing therein to form a basis for raising a Federal question. It is evident that defendants' purpose in seeking to reopen the case was to explore the possibilities of establishing evidence upon which to base a Federal question. Defendants should have availed themselves of this opportunity during the trial of the cause. There was no abuse of discretion on the part of the trial court in denying defendants this privilege.

The decree of the trial court is affirmed and remanded to the circuit court of Wayne county for injunctive relief, with costs to plaintiffs.

Butzel, C. J., and Carr, Bushnell, Boyles, Reid, Dethmers, and Kelly, JJ., concurred.